**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **YAZMIN JUÁREZ COYOY, ON HER OWN BEHALF AND AS SURVIVING PARENT OF MARIEE CAMYL NEWBERRY JUÁREZ,** | § § § § § | **CIVIL ACTION NO. 5:19-cv-916** |
| **Plaintiff,** | § § | **JURY TRIAL DEMANDED** |
| **v.** | § § | |
| **CORECIVIC, INC.,** | § § | |
| **Defendant.** | § § | |

## PLAINTIFF YAZMIN JUÁREZ COYOY'S ORIGINAL COMPLAINT

Plaintiff Yazmin Juárez Coyoy ("Plaintiff" or "Ms. Juárez") files this Original Complaint against Defendant CoreCivic, Inc. ("Defendant" or "CoreCivic"), stating as follows:

### INTRODUCTION

1.     This suit seeks to hold CoreCivic—one of the nation's largest private prison companies—to account for its role in the needless death of Mariee Camyl Newbery Juárez, just three months shy of her second birthday.

2.     Mariee was a healthy, happy eighteen-month-old girl when she and her mother, Yazmin Juárez Coyoy, crossed the Rio Grande into southern Texas in early March 2018, fleeing violence and persecution in their native Guatemala.  Ms. Juárez had hoped to find safe haven and a better life for herself and her baby in the United States.  Instead, shortly after spending nearly three weeks at CoreCivic's "South Texas Family Residential Center" in Dilley, Texas—a 2,400-bed jail for immigrant families and children in the custody of U.S. Immigration and Customs Enforcement—Mariee was dead.

3.      CoreCivic's operation of the Dilley facility was fraught from its inception.  In 2014, ICE tapped CoreCivic (then known as Corrections Corporation of America or CCA) to construct and operate the Dilley detention facility for families and children, even though in 2009, the U.S. government had closed a different CoreCivic family detention facility because of serious concerns about conditions there.  Making matters worse, ICE and CoreCivic deliberately shielded their dubious arrangement for Dilley's operation from public and private oversight. Rather than complete the federal procurement processes that would normally be necessary for a new contract of this nature, ICE came up with an existing inter-governmental services agreement between the City of Eloy, Arizona and ICE.  ICE and CoreCivic negotiated with Eloy (a small Arizona city 900 miles away from Dilley) to "modify" that agreement to include the new Dilley facility, and for Eloy to subcontract the work constructing and operating the facility to CoreCivic.  In exchange for its role in this sham, Eloy received an annual payment of $438,000.

4.      In a 2018 published report, the Department of Homeland Security's Office of the Inspector General found this workaround by ICE improper—but not before CoreCivic raked in record profits from its new family detention facility in Dilley.  Over the first four years of Dilley's operation, CoreCivic reported more than $800 million in revenue from Dilley alone.

5.      CoreCivic has not publicly reported how much it spends to operate the Dilley detention facility.  But it is the people held in CoreCivic's facilities—in unsafe and unsanitary conditions, without access to proper health care—who have borne the terrible costs of this private prison enterprise.  None has paid more dearly than Ms. Juárez and her baby daughter Mariee.

6.      Mariee died from an entirely preventable and treatable illness that she contracted while she and her mother were detained in crowded, cramped conditions with many other sick

children at Dilley.  What began as an ordinary infection went woefully undertreated during Mariee's detention at CoreCivic's facility.  Mariee got sicker and sicker, deteriorating from a cough and runny nose to a 104-degree fever, constant diarrhea and vomiting, rapid weight loss, a depressed blood oxygen level, and increased heart rate.  At least twice, Ms. Juárez and Mariee waited hours to be seen by clinic staff, only to be turned away at the close of working hours without treatment and sent back to the disease-ridden quarters in which immigrants were housed. When clinic staff did see Mariee, their examinations were cursory, and the treatments fell far below the standard of care.  This was not merely an error in medical judgment.  It was flagrant neglect of a gravely sick child.

7.     Mariee's condition continued to deteriorate.  Clinic staff finally told Ms. Juárez that they would refer Mariee to a medical provider.  But ICE instead released Ms. Juarez and Mariee and cleared them to travel on a commercial airline flight from Texas to New Jersey.  ICE medical records state that, on March 25, 2018, a "licensed vocational nurse" conducted a "Transfer Summary" and "medically cleared" Mariee for release from Dilley, noting no medical reasons to restrict her travel.  That record was falsified.  Under state law, the licensed vocational nurse was not qualified to provide such a medical evaluation or clearance.  And, in fact, she didn't.  Neither the nurse—nor anyone else with medical training—examined Mariee that day.

8.     Had the nurse or anyone with a modicum of medical training seen Mariee, it would have been apparent that she was in dire condition when released from Dilley, and that clearing her for air travel placed her at grave medical risk.  Indeed, within one day after her release from ICE custody, within hours of arriving in New Jersey, Mariee was admitted to a local hospital's pediatric intensive care unit in acute respiratory distress with a critically low blood oxygen level.  But it was too late to rescue her.

9.     During the last weeks of her short life, as doctors fought to stop her relentless deterioration, Mariee was transferred to two additional hospitals for increasingly specialized care.  She endured agonizing treatments and never left intensive care.  Mariee died on May 10, 2018.  On the day her daughter died, Ms. Juárez left the hospital with only an ink print of Mariee's right hand, which the nurses made the day before as a Mother's Day gift.

10.     CoreCivic, as operator of the Dilley facility, had the responsibility to ensure the well-being of the children detained there.  CoreCivic's dereliction of this responsibility exacerbated the harms inherent in family detention.  CoreCivic held families and small children in overcrowded quarters, creating prime conditions for the spread of sickness, and did nothing to ensure that those families and children received adequate medical care.  As a result of CoreCivic's recklessness, negligence, and callous indifference to the health and safety of the families and small children detained at Dilley, Mariee suffered an agonizing death, and Ms. Juárez suffered the unimaginable pain of watching her only child sicken, suffer, and die before her eyes.

11.     CoreCivic must now answer for Mariee's pain and suffering and her tragic death, and for the severe mental pain, distress, loss of love and companionship, and other harms Ms. Juárez has endured from the suffering and death of her little girl.

**JURISDICTION AND VENUE**

12.     This Court has diversity jurisdiction under 28 U.S.C. § 1332.

13.     Plaintiff Yazmin Juárez Coyoy is an individual and a native of Guatemala who resides in New Jersey.

14.     Defendant CoreCivic, Inc. is a private, for-profit prison company incorporated under the laws of the State of Maryland with its principal place of business in Nashville, Tennessee.  CoreCivic conducts extensive business in Texas and may be served with process by

serving its registered agent for service of process in the State of Texas, C T Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

15.     The amount in controversy exceeds $75,000, excluding interest and costs.

16.     Venue is proper in the Western District of Texas, San Antonio Division, because all or a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in Dilley, Texas, which is situated in that judicial district. *See* 28 U.S.C. § 1391(b)(2).

17.     This Court has personal jurisdiction over CoreCivic. This lawsuit arises out of the death of Ms. Juárez's one-year-old daughter, which resulted from CoreCivic's misfeasance and malfeasance in running the South Texas Family Residential Center in Dilley, Texas.

## PARTIES

18.     Mariee Camyl Newberry Juárez, a native of Guatemala, was 21 months old when she died from a respiratory illness she contracted while detained in abysmal conditions with her mother at the South Texas Family Residential Center, an immigration detention facility for families and children located in Dilley, Texas.

19.     Plaintiff Yazmin Juárez Coyoy is the surviving mother of Mariee Juárez. Ms. Juárez is a native of Guatemala and currently resides in Plainfield, New Jersey.

20.     Defendant CoreCivic, Inc. is the nation's second-largest private, for-profit prison company. CoreCivic has operated the South Texas Family Residential Center in Dilley since the facility opened in 2014, first as a subcontractor to the City of Eloy, Arizona, and more recently as a subcontractor to the City of Dilley, Texas.

## FACTUAL BACKGROUND

**A.    CoreCivic Has a Long and Well-Documented History of Mistreating and Endangering Detainees**

21.     CoreCivic was the nation's first private, for-profit prison company.  Incorporated in 1983, it grew rapidly in the 1980s as it capitalized on the record inmate populations produced by the war on drugs and mandatory minimum sentencing laws.[1]

22.     In the ensuing decades, CoreCivic has profited at the expense of the health and lives of the people whom the company imprisons and detains.  Investigations by journalists and oversight committees have uncovered serious inadequacies in the treatment of people detained at CoreCivic facilities across the country.[2]  Dozens of detainees have died.[3]  A host of deaths at CoreCivic facilities over more than a decade have resulted from treatable conditions that went neglected.  For example:

- In 2005, a detainee at a CoreCivic facility died from cardiac arrest following unavailing attempts to seek medical attention after severe symptoms of a heart attack went untreated for hours.  Following other delays, the detainee was left to wait for an hour in the medical waiting area before a nurse finally called an ambulance.  He died on arrival at the emergency room.[4]

---

[1] "CCA - Our History," http://www.correctionscorp.com/our-history; Eric Schlosser, *The Prison-Industrial Complex*, The Atlantic (Dec. 1998), https://www.theatlantic.com/magazine/archive/1998/12/the-prison-industrial-complex/304669/.

[2] *See, e.g.*, *Audit of the United States Marshals Service Contract No. DJJODT7C0002 with CoreCivic, Inc., to Operate the Leavenworth Detention Center*, Leavenworth, Kansas, Office of the Inspector General, U.S. Department of Justice (April 2017), https://oig.justice.gov/reports/2017/a1722.pdf; Seth Freed Wessler, *The 25 Men Whose Lives Ended Under Questionable Circumstances*, Nation (Jan. 28, 2016), https://www.thenation.com/article/25-deaths-in-contract-facilities/.

[3] Jeanne Kuang, *Immigration Detention Deaths Reach the Highest Total Since 2009*, Houston Chron. (Jan. 16, 2018, 12:22 p.m. CT), https://www.houstonchronicle.com/news/houston-texas/houston/article/Immigration-detention-deaths-reach-the-highest-12494624.php.

[4] Nina Bernstein & Margot Williams, *Immigration Agency's Revised List of Deaths in Custody*, N.Y. Times (Apr. 2, 2009), https://www.nytimes.com/2009/04/03/nyregion/03detainlist.html; Nina Bernstein & Margot Williams, *Documents Related to the Death of Ahmad Tanveer*, N.Y. Times (Apr. 2, 2009), https://www.nytimes.com/2009/04/03/nyregion/03detaindocs.html.

- In 2006, a detainee at a CoreCivic facility died from an aneurysm after displaying symptoms including weakness and dizziness. The facility has no record that it ever conducted a physical examination, but records show the detainee placed a sick call that medical staff ignored for four days. When a nurse finally responded, she told the officer who worked there that she was not qualified to assess the detainee's health condition: "I am only a pill-pusher," she said.[5]

- In 2007, a detainee at a CoreCivic facility died from undiagnosed testicular cancer despite his repeated attempts to seek medical treatment.[6]

- In 2011, a detainee at a CoreCivic facility collapsed. Rather than initiate CPR or use a defibrillator, medical staff waited ten minutes for emergency medical technicians to arrive. The detainee died as a result of the delay. His death followed weeks of daily double-doses of his medications due to the negligence of medical staff.[7]

- In 2011, another CoreCivic detainee died from cardiomyopathy following four months of worsening, untreated medical problems, including vomiting after every meal.[8]

- In 2012, a detainee at a CoreCivic facility died from untreated diabetes and pneumonia after numerous delays—including a policy that restricted which staff could call 911—caused a delay of eight hours between the inception of his trouble breathing and his arrival for treatment at an emergency room. Medical experts who reviewed the case agreed that his death was "very likely preventable . . . [i]f diagnosed properly and treated."[9]

---

[5] Stacey A. Tovino, *The Grapes of Wrath: On the Health of Immigration Detainees*, 57 B.C.L. Rev. 167, 175 (2016), available at https://lawdigitalcommons.bc.edu/cgi/viewcontent.cgi?article=3481&context=bclr; Nina Bernstein, *Man's Death in Private Immigration Jail Bares Difficulty of Detention Overall*, N.Y. Times (Aug. 21, 2016), https://archive.nytimes.com/query.nytimes.com/gst/fullpage-9B00E1D9163AF932A1575BC0A96F9C8B63.html.

[6] Nina Bernstein, *Man's Death in Private Immigration Jail Bares Difficulty of Detention Overall*, N.Y. Times (Aug. 21, 2016), https://archive.nytimes.com/query.nytimes.com/gst/fullpage-9B00E1D9163AF932A1575BC0A96F9C8B63.html.

[7] *Code Red: The Fatal Consequences of Dangerously Substandard Medical Care in Immigration Detention*, Human Rts. Watch (June 20, 2018), https://www.hrw.org/report/2018/06/20/code-red/fatal-consequences-dangerously-substandard-medical-care-immigration; *Fatal Neglect: How ICE Ignores Deaths in Detention*, ACLU (Feb. 24, 2016), https://www.aclu.org/sites/default/files/field_document/fatal_neglect_acludwnnijc.pdf.

[8] *Fatal Neglect: How ICE Ignores Deaths in Detention*, ACLU (Feb. 24, 2016), https://www.aclu.org/sites/default/files/field_document/fatal_neglect_acludwnnijc.pdf.

[9] *Systemic Indifference: Dangerous & Substandard Medical Care in US Immigration Detention*, Human Rts. Watch (May 18, 2017), https://www.hrw.org/report/2017/05/08/systemic-indifference/dangerous-substandard-medical-care-us-immigration-detention.

- In 2014, a detainee at a CoreCivic facility with a known history of heart attacks died from a heart attack after informing nurses on six separate occasions that she was having chest pain.  None of the nurses ever contacted a physician or called an ambulance.[10]

- In 2014, a CoreCivic detainee with a history of hypertension died from a brain lesion.  Medical staff had failed to provide the blood pressure monitoring required by the applicable treatment plan for hypertension, failed to perform an ordered electrocardiogram, and failed to respond to his complaints of blurry vision, a telltale sign of an intracranial bleed.  When the detainee collapsed in full view of a correctional officer, staff took eight minutes to call 911. Three more minutes elapsed before CPR was started.  And an additional two minutes elapsed before staff applied an automated external defibrillator.[11]

- In 2014, a CoreCivic detainee died of liver failure, after medical staff administered, without proper monitoring, an antibiotic known to cause liver failure .  Records later revealed that prison nurses had administered 30 excess doses of the antibiotic.[12]

- In 2016, a CoreCivic detainee died of a heart attack, after alerting a nurse practitioner that he took heart medications and had a pre-existing heart conditions, and after telling an officer that he was experiencing chest pain.  Rather than call a medical emergency, facility staff initiated a transfer to a detention center located between three and four hours away for medical care.  The detainee died at the second detention center the day after the transfer.[13]

23.     The former deputy director of ICE recently acknowledged that, although the

U.S. government's partnership with private prison companies "was supposed to make things

much more effective, much more economical," the parties "fell behind" and "fell short" in "the

execution and the monitoring and the auditing."  He further acknowledged that "[i]t wasn't

[private prison companies'] priority to ensure that the highest standards were being met."[14]

---

[10] *Id*.

[11] *Id*.

[12] Seth Freed Wessler, *The 25 Men Whose Lives Ended Under Questionable Circumstances*, Nation (Jan. 28, 2016), https://www.thenation.com/article/25-deaths-in-contract-facilities/.

[13] *Code Red: The Fatal Consequences of Dangerously Substandard Medical Care in Immigration Detention*, Human Rts. Watch (June 20, 2018), https://www.hrw.org/report/2018/06/20/code-red-fatal-consequences-dangerously-substandard-medical-care-immigration

[14] Clyde Haberman, *For Private Prisons, Detaining Immigrants Is Big Business*, N.Y. Times (Oct. 1, 2018), https://www.nytimes.com/2018/10/01/us/prisons-immigration-detention.html.

24.     On August 18, 2016, after years of mounting reports of abuses at privately-run prisons and detention facilities, the Justice Department ordered the Federal Bureau of Prisons to end or reduce reliance on contracts with private prison operators.  In the memorandum announcing the order, then-Deputy Attorney General Sally Yates stated that private prisons "compare poorly" to Bureau-run facilities and outlined findings that they "do not maintain the same level of safety and security" and "do not provide the same level of correctional services, programs, and resources."[15]

25.     Around the same time, CoreCivic shed its former name, Corrections Corporation of America, and rebranded itself as "CoreCivic."[16]  The change reached no deeper than the name. The company's business model—and its disregard for the welfare of immigrants and detainees— remained untouched.

26.     Meanwhile, the federal government's efforts to reexamine and reduce its reliance on private prison operators were short-lived.  On February 23, 2017, then-Attorney General Jeff Sessions rescinded the Justice Department's guidance on contracts with private prison operators.[17]  Within a month of President Trump assuming office, CoreCivic's stock price

---

[15] Letter from Deputy Attorney General Sally Yates to Acting Director of Federal Bureau of Prisons (Aug. 18, 2016), available at https://www.justice.gov/archives/opa/file/886311/download.

[16] David Boucher, *CCA Changes Name to CoreCivic Amid Ongoing Scrutiny*, The Tennessean (Oct. 28, 2016), https://www.tennessean.com/story/news/2016/10/28/cca-changes-name-amid-ongoing-scrutiny/92883274/.

[17] Christopher Dean Hopkins, *Private Prisons Back in Mix for Federal Inmates as Sessions Rescinds Order*, NPR (Feb. 23, 2017), https://www.npr.org/sections/thetwo-way/2017/02/23/516916688/private-prisons-back-in-mix-for-federal-inmates-as-sessions-rescinds-order.

increased by 140 percent, and the stock of CoreCivic's largest competitor, GEO Group, increased by 98 percent.[18]

27.    Immigrant-rights groups and others continued to sound alarms about the conditions for detainees held in immigration detention.  In response to these concerns, the Department of Homeland Security Office of Inspector General conducted unannounced inspections of several detention facilities.  In a report published December 11, 2017—some 15 months before Mariee was incarcerated—the DHS OIG detailed grave concerns about the treatment and care of people detained at immigration detention facilities.  The findings were dire and unequivocal:  "[W]e identified problems that undermine the protection of detainees' rights, their humane treatment, and the provision of a safe and healthy environment."[19]

28.    Among the problems denounced by the OIG's December 2017 report were unsanitary conditions and inadequate medical care.  Sanitation violations included complaints that "basic hygienic supplies, such as toilet paper, shampoo, soap, lotion, and toothpaste, were not provided promptly or at all when detainees ran out of them."  And detainee bathrooms were in "poor condition," containing mold and often lacking either hot or cold water.

29.    In the kitchens, the OIG "observed spoiled, wilted, and moldy produce and other food in kitchen refrigerators, as well as food past its expiration date."  Inspectors likewise "found expired frozen food, including meat, and thawing meat without labels[.]"  The OIG concluded that these food handling and safety issues "could endanger the health of detainees," and

---

[18] Heather Long, Private Prison Stocks Up 100% Since Trump's Win, CNN Business (Feb. 24, 2017), https://money.cnn.com/2017/02/24/investing/private-prison-stocks-soar-trump/index.html.

[19] U.S. Department of Homeland Security Office of the Inspector General, *Concerns About ICE Detainee Treatment and Care at Detention Facilities* (Dec. 11, 2017), https://www.oig.dhs.gov/sites/default/files/assets/2017-12/OIG-18-32-Dec17.pdf.

recommended that ICE increase its engagement and interaction with the privately-run detention facilities and their operations.

30.     The OIG's December 2017 report also highlighted issues with the medical care provided in immigration detention facilities, including "long waits for the provision of medical care."  The waits "includ[ed] instances of detainees with painful conditions, such as infected teeth and a knee injury, waiting days for medical intervention."  On top of the delays, inspectors observed a pattern of failures to document detainees' medical requests and outcomes in detainee and facility medical files.

31.     A third-party report on detention conditions at CoreCivic facilities published more than two years before Mariee's incarceration highlighted similar problems.[20]  According to the report, food and water conditions were "particularly concerning."  Food at the CoreCivic facilities was "frequently reported as spoiled or expired," and contained "foreign objects, such as hair, plastic, bugs, rocks, a tooth, and mice."  Detainees report receiving rancid meat, and one immigrant said that detainees were once "fed beans that had maggots growing in them" for a week.  Many immigrants reported losing between ten and seventy pounds during their detention.

32.     CoreCivic's water supply was described variously "as green, non-potable, smelling of feces, or completely shut off."  Indeed, detainees reported that the water was so discolored that their white garments "bec[a]me green" when washed in the sink water.  As a result of the poor water quality, some detained immigrants boiled water in their cells before they drank it.

---

[20] Penn State Law, Centers for Immigrants' Rights Clinic, *Imprisoned Justice: Inside Two Georgia Immigrant Detention Centers* (May 2017), https://projectsouth.org/wp-content/uploads/2017/06/Imprisoned_Justice_Report-1.pdf (describing conditions at immigration detention facilities, including the Stewart Detention Facility, which is operated by CoreCivic).

33.     Taken together, the combination of "poor food quality and quantity, lack of clean water, and unhygienic conditions create[d] an environment where bacteria c[ould] flourish, causing detained immigrants to develop health issues."  Yet the report found that the medical care provided to deal with such health issues was also severely inadequate.

34.     Medical units were "desperately understaffed," and people who required medical assistance had to sign up at 5:00 a.m. for a chance to be seen.  Those who missed the cut-off had to wait until the following day to receive care.  One man reported that it could take up to six months before detained immigrants saw an actual doctor, and that his last consultation with a doctor was by videoconference.

35.     Many detainees who did receive medical care reported that they received only over-the-counter pain killers, even though thorough physical examinations or other medical care were more appropriate or medically required (such as for broken bones).  One immigrant reported that his roommate was given only painkillers for a severe bump on his leg, notwithstanding his pleas that he be taken to a hospital.  Only when the bump tripled in size and became severely infected was he finally taken to a hospital and operated on, leaving a large sore and scar.[21]

**B.     CoreCivic and ICE Negotiate a Highly Irregular and Lucrative Contract for the Construction and Operation of the Dilley Family Detention Facility**

36.     Beginning in 2013 and 2014, thousands of families and unaccompanied children fled their homes in Central America's Northern Triangle region—Honduras, Guatemala, and El Salvador—journeying north to the United States to seek refuge from violence, persecution, and abuse.

---

[21] *Id.*

37.     To manage this wave of migration, the U.S. government partnered with private prison companies to create several new detention centers to house the increasing numbers of children and families apprehended at the United States' southwest border.  One such detention center was the Dilley facility, a 2,400-bed family detention center.

38.     ICE tapped CoreCivic (then known as Corrections Corporation of America or CCA)—the nation's second largest for-profit prison company—to build and operate the Dilley detention facility.

39.     ICE chose CoreCivic even though, in 2009, the U.S. government had closed a different family detention facility run by CoreCivic because of serious concerns about its operation and detention conditions.  According to the Washington Post, "[b]etween 2006 and 2009 . . . CCA ran a facility in Taylor, Texas [where] [c]hildren wore prison uniforms, received little education and were limited to one hour of play time per day."[22]

40.     Nevertheless, ICE deemed CoreCivic an acceptable contractor and the parties negotiated a four-year, $1 billion deal for CoreCivic to build and operate the Dilley detention facility.

41.     Ordinarily, the federal government awards contracts of this nature only after a formal procurement process.  That process is highly regulated to maximize competition among potential vendors, including companies like CoreCivic, and to ensure public and private oversight over the selection process.  But citing the significant delay this protective process would entail, ICE and CoreCivic instead contrived a workaround that allowed CoreCivic to

---

[22] Chico Harlan, *Inside the Administration's $1 Billion Deal to Detain Central American Asylum Seekers*, Wash. Post (Aug. 14, 2016),
https://www.washingtonpost.com/business/economy/inside-the-administrations-1-billion-deal-to-detain-central-american-asylum-seekers/2016/08/14/e47f1960-5819-11e6-9aee-8075993d73a2_story.html?utm_term=.d8ac67403f71.

begin work immediately, with neither the safeguards nor the accountability the procurement process provides.

42.     The workaround relied on an existing 2006 Inter-Governmental Service Agreement ("IGSA") between ICE and the City of Eloy, Arizona.  Under the 2006 IGSA, Eloy was responsible for the operation of a detention facility located in the City of Eloy for up to 1,500 adult immigration detainees.  Eloy then subcontracted with CoreCivic, which owns and operates the facility, to provide minimum- and medium-security housing for adult male and female detainees in accordance with the 2006 IGSA.

43.     The CoreCivic facility in Eloy holds the record for the most detainee deaths at a single immigration detention center in the United States--15 known deaths between 2003 and 2017.[23]

44.     Instead of initiating a procurement process and soliciting bids for the contract to build and operate the new detention facility in Dilley, ICE and CoreCivic negotiated a "modification" to Eloy's 2006 IGSA.  This so-called modification tacked on the construction and operation of the entirely separate, new, and unrelated facility in Dilley, Texas—900 miles away from Eloy.  The idea was that Eloy would then subcontract with CoreCivic to construct and operate the Dilley facility.

45.     ICE's Commercial and Administrative Law Division (within the Office of the Principal Legal Advisor) advised ICE that the proposed modification was probably illegal, because, among other things, the proposed changes relating to the new Dilley detention facility were likely outside the scope of the original IGSA, which was for adult detention only.

---

[23] *Systemic Indifference: Dangerous & Substandard Medical Care in US Immigration Detention*, Human Rts. Watch (May 18, 2017), https://www.hrw.org/report/2017/05/08/systemic-indifference/dangerous-substandard-medical-care-us-immigration-detention.

46.     Nevertheless, on September 22, 2014, CoreCivic officials met with Eloy's City Council to request that Eloy modify its existing IGSA according to the terms that CoreCivic and ICE had negotiated.  At CoreCivic's behest, and in exchange for $438,000 a year, Eloy signed on.  The next day, ICE executed the IGSA modification.  The agreement did not identify CoreCivic as a party.  Eloy then subcontracted with CoreCivic to provide the detention services described in the modified IGSA at Dilley.

47.     The modified IGSA that CoreCivic agreed to perform as a subcontractor to Eloy set numerous detailed requirements for the operation of the Dilley detention facility, including requirements for services to be provided to detainees.  The stated purpose of the IGSA was "to sustain a program of temporary shelter in a *safe and secure* environment."[24]

48.     The IGSA required the Service Provider to "seek licensing from the State agency responsible for residential programs that house juveniles (and family groups if applicable). Should the Service Provider be unable to secure State licensure, the Service Provider shall nonetheless comply with all substantive requirements for State-licensed residential care programs and seek application of such requirements to the family residential center by the State."

49.     In Texas, responsibility for the licensing of child care facilities lies with the Texas Health and Human Services Commission, Child Care Licensing.  The Commission's regulations confirm that, absent an individual waiver, an ICE "family residential center" for detaining immigrant families and children is deemed a "general residential operation (GRO) and must comply with all associated requirements for GROs," except that ICE centers can detain more

---

[24] South Texas Family Residential Center Performance Work Statement at 1, *in* South Texas Family Residential Center City of Eloy IGSA Modification (Sept. 15, 2014), https://www.ice.gov/doclib/foia/contracts/south_texas_family_residential_center_city_of_eloy_i gsa_modification.pdf (emphasis added).

than four people, and in some circumstances unrelated people, in a single room.  Texas Admin. Code § 748.7.

50.     Under the Texas regulations that CoreCivic was obligated to follow, a general residential operation, upon admitting a child into care, must provide medical care to the child "as needed for injury, illness, and pain," and "as needed for ongoing maintenance of medical health." *Id.* § 748.1531.  Medical care must be provided by "a health-care professional licensed in the United States to practice in an appropriate medical or health-care discipline."  *Id.* § 748.1535. "A licensed physician must review a child's primary medical needs … whenever a medical or related problem occurs."  *Id.* § 748.1551.

51.     Under the modified ICE-Eloy IGSA relating to the Dilley detention facility, the Service Provider—CoreCivic must provide "[p]roper physical care … in accordance with applicable law and the [Family Residential Standards]."

52.     The IGSA also allowed ICE "to use a medical provider proposed by the Service Provider, another service provider of its own choice, or to use its own Medical Provider, as determined by [ICE Health Service Corps]," an entity within ICE responsible for providing direct patient care.  On information and belief, ICE Health Service Corps provided medical services at Dilley at all relevant times.

53.     While ICE Health Service Corps delivered the actual medical services, the IGSA obligated CoreCivic to "provide a medical and dental facility adequately sized to the population of the Center and [to] provide all medical, dental, and mental health equipment and supplies." The IGSA further spelled out CoreCivic's obligation to "maintain medical facilities and all medical equipment in good working condition and ensure adequate stocks of medical supplies are maintained."  The IGSA left no doubt regarding CoreCivic's integral role in the medical care

of detainees, requiring it to "provide residents access to medical services in the medical facility 24 hours per day, 7 days per week, [to] provide security staffing for the medical facility. . . [and to] provide twenty-four (24) hour transportation for off-site medical referrals."

54.     The modified IGSA further stated:  "All residential staff employed by the Service Provider shall meet the FRS [Family Residential Standards] requirements for First Aid and Medical Emergencies, including being trained initially and annually on how to respond to health-related emergencies, administering first aid and CPR, and obtaining emergency medical assistance."

55.     The modified IGSA also required CoreCivic to avoid the spread of disease at the facility, stating  that, "[w]hen communicable or debilitating physical problems are suspected," CoeCivic must "separate[ the detainee] from the detainee population, and immediately notify [U.S. Public Health Service] staff."

56.     CoreCivic voluntarily assumed the contractual responsibility for supervising the Dilley detention facility and making sure its operation complied with the following terms: "ICE's Quality Assurance Surveillance Plan (QASP) is based on the premise that the Service Provider, and not the Government, is responsible for the day-to-day operation of the Facility and all the management and quality control actions required to meet the terms of the Agreement. The role of the Government in quality assurance is to ensure performance standards are achieved and maintained.  The Service Provider shall develop a comprehensive program of inspections and monitoring actions and document its approach in a Quality Control Plan (QCP)."

57.     On February 21, 2018, the DHS OIG published a report finding that the 2014 modification of the ICE-Eloy IGSA was inappropriate and undermined accountability.  OIG determined that "[a]lthough ICE should have contracted directly with the private company that

operates the South Texas Family Residential Center, CCA [CoreCivic], it instead created an unnecessary 'middleman' by modifying its existing IGSA with Eloy."[25]

58.    The Dilley facility was an immediate bonanza for CoreCivic.  While Dilley was just one of 74 facilities operated by CoreCivic, the Dilley arrangement with ICE, channeled through Eloy, generated 14% of CoreCivic's business revenue.[26]  CoreCivic's earnings revenue rose by 6% in 2015, an increase the company "primarily attribut[ed]" to the Dilley contract.[27]

59.    According to CoreCivic's 10-K filings, during the years ended December 31, 2016 and December 31, 2015, the company recognized $267.3 million and $244.7 million, respectively, in revenue from the Dilley facility.[28]  In its 2018 10-K filing, CoreCivic disclosed that, as a result of a 2016 amendment to the IGSA providing for a lower cost structure, "the revenues generated at the South Texas Family Residential Center declined and operating margin percentages at the facility became more comparable to those of our average owned and managed facilities."  Still, CoreCivic reported $170.6 million in revenue in 2017, and $171.3 million in 2018 from the facility.

---

[25] *Immigration and Customs Enforcement Did Not Follow Federal Procurement Guidelines When Contracting for Detention Services*, Office of the Inspector General, U.S. Department of Justice (Feb. 21, 2018), https://www.oig.dhs.gov/sites/default/files/assets/2018-02/OIG-18-53-Feb18.pdf.

[26] Chico Harlan, *Inside the Administration's $1 Billion Deal to Detain Central American Asylum Seekers*, Wash. Post (Aug. 14, 2016), https://www.washingtonpost.com/business/economy/inside-the-administrations-1-billion-deal-to-detain-central-american-asylum-seekers/2016/08/14/e47f1960-5819-11e6-9aee-8075993d73a2_story.html?noredirect=on&utm_term=.c4a64e291143&wpisrc=nl_heads-draw6&wpmm=1.

[27] https://globenewswire.com/news-release/2016/02/10/809594/0/en/CCA-Reports-Fourth-Quarter-and-Full-Year-2015-Financial-Results.html

[28] CoreCivic Inc., Form 10-K Annual Report, U.S. Securities and Exchange Commission, at 62 (Feb. 22, 2018), http://ir.corecivic.com/static-files/6e38a54c-cdea-4ff9-ba06-f24d38a6ad60; CoreCivic Inc., Form 10-K Annual Report, U.S. Securities and Exchange Commission, at 34 (2015), http://ir.corecivic.com/static-files/60284e8d-f98f-40d2-97c1-50d7f9d1afcb.

60.     At a conference for CoreCivic investors in June 2018, CoreCivic's Chief Executive Officer announced that the company was enjoying "the most robust kind of sales environment we've seen in probably ten years."[29]

### C.     CoreCivic Endangers and Mistreats Detainees at Dilley

61.     While raking in profits, CoreCivic has continued its pattern of negligent and reckless behavior at its detention facilities.  The Dilley facility is no exception.

62.     In the nearly five years of Dilley's operation, outside groups have repeatedly identified significant failings in the conditions and medical care provided at the facility.

63.     In 2015, a group of direct legal services providers lodged formal complaints about the inadequate medical care ICE provided, cataloguing numerous examples of indifference and disregard for the health of detainees.[30]  Despite its contractual and legal responsibility to provide proper physical care of people detained in its facilities and to ensure compliance with state-law standards for the provision of medical care in child care facilities, CoreCivic turned a blind eye to the neglect and abuse at Dilley.

64.     The organizations observed that mothers and children often come to Dilley with injuries or illnesses that go untreated during their confinement.  Others develop illnesses while in detention, but also receive inadequate medical care.

---

[30] Letter to Megan Mack, DHS Office of Civil Rights and Civil Liberties (CRCL), and John Roth, DHS Office of the Inspector General (OIG), Regarding ICE's Failure to Provide Adequate Medical Care to Mothers and Children in Family Detention Facilities (July 30, 2015), available at https://www.aila.org/advo-media/press-releases/2015/deplorable-medical-treatment-at-fam-detention-ctrs/public-version-of-complaint-to-crcl; Letter to CRCL and OIG Regarding ICE's Continued Failure to Provide Adequate Medical Care to Mothers and Children Detained at the South Texas Family Residential Center (Oct. 6, 2015), available at https://www.aila.org/advo-media/press-releases/2015/crcl-complaint-family-detention/cara-jointly-filed-a-complaint.

65.     The organizations also noted that women and children are routinely made to wait between three and fourteen hours to receive medical care, even when the patient's condition was serious and urgent.  At least once, a mother who had to leave her place in line after waiting for hours to receive care was forced to sign a letter stating that she had refused medical care.  These delays often exacerbated detainees' health problems.

66.     For example, the organizations reported that:

- A child's weight loss during two months in detention worried her mother, who sought medical care for her at the Dilley clinic three times.  However, "it was not until the child collapsed and the clinic held her overnight that her illness was properly treated."

- A seven-year-old boy repeatedly sought medical care at the clinic and was turned away.  When the child finally took a urine test, he was rushed to a hospital in San Antonio and diagnosed with juvenile diabetes.  Even after this incident, the clinic turned him away when he went for his scheduled follow-up appointment.

- When a mother took her two-year-old daughter to the clinic with a respiratory virus, the nurse told her that "all of the children here" have that illness.  The girl later developed asthma in the facility, but the mother had to seek medical care on seven occasions before her daughter received medical attention.  The girl now must take daily prescription medication and use an inhaler four to eight times a day to treat the asthma she developed while at CoreCivic's facility.

67.     Even when patients did receive medical treatment at Dilley, the organizations noted disturbing deficiencies.  For example, the organizations reported that:

- A two-year-old boy received five vaccinations in his leg in a single appointment despite his mother's protests that he was up to date on all of his vaccinations.  After the vaccinations, the boy could not walk, spiked a high fever, and could hardly eat.

- A mother who sought psychological treatment while at Dilley was forced to conduct all of her appointments with her ten-year-old daughter in the room, even though the daughter cried every time the mother started to tell her story.  The family fled Honduras because a gang there had beaten the daughter.  The mother's psychologist told her the daughter had to stay in the room for the appointments, and "gave [the daughter] some gum to calm her down."  After the mother later attempted suicide, the Dilley staff held both mother and daughter in isolation for three days.

- A twelve-year-old girl had to flee El Salvador without her glasses. On arrival at Dilley, her mother immediately notified staff that her daughter would need a new pair, and the girl underwent eye testing, after which doctors assured her mother that she would receive the glasses. Six weeks later, her daughter had still not received them. Because of her impaired vision, she suffered from headaches and had trouble at school.

- A two-year-old boy had diarrhea for 15 straight days; his mother sought medical attention at the Dilley clinic seven days in a row. On six of those seven days, she was turned away after a six-plus hour wait. On the one day she managed to see a nurse, the "medical advice" was "to have her son drink water."

68. One detained mother, a registered nurse with ten years of experience, "felt there was no point in returning to the clinic" after the attending nurse at the clinic told her that "no doctor was on site [and] she was not authorized to prescribe medication." The nurse recommended that the mother treat her four-year-old son's cough and eight-pound weight loss with "water and Pedialyte."

69. Medical staff at Dilley routinely "prescribed" water as a remedy for detainees who sought care, regardless of the illnesses or injuries presented and despite the adulteration of the water available at the facility. Medical staff suggested water as a treatment for, among other things, broken bones, weight loss, and in one case, a toddler's vomiting blood.

70. These insufficiencies persisted. In 2017, the CARA Pro Bono Project obtained a series of declarations by Dilley detainees detailing the same inadequacies in the medical care provided at Dilley.

71. An eighteen-year-old woman who had fled El Salvador with her two-year-old daughter said that after a week at Dilley, her daughter became sick "with a fever, congestion, and a cough," and was not breathing well. She took her daughter to Dilley's central clinic. The staff "told me [my daughter] was fine and did not give her any medicine." A day later, the clinic gave her ibuprofen for her daughter.

21

72.     The next day, a doctor told her that he would give her five days of antibiotics to treat her child's illness.  However, when the mother visited the pharmacy, the pharmacist only gave her medication for one day, and refused to provide additional days' worth of treatment despite her repeated visits to ask for more medication.  It is well-known that too short a course of antibiotics can exacerbate an infection.

73.     Two days later, her daughter's condition had deteriorated:

On the night of Tuesday, October 24, [my daughter] was very sick.  My roommates and I were very worried because she was just lying in bed and not even looking around.  Sometimes she would sit up and try to breathe with great difficulty.  One of my roommates and I took her to the clinic . . . at 8 p.m. . . . The medical staff said that there were not doctors available at night, and gave me an appointment for the next day.

The next day a CoreCivic staff came to my room and said that [my daughter] had a doctor's appointment.  When we arrived at the clinic, she was in a very bad state.  She was not breathing well, could not hold her eyes open or lift her head, and did  not move or react when people talked to her.  The medical staff listened to her lungs and measured her oxygen level . . . [and] told me that they did not have a sufficient oxygen supply to treat her, so they called the hospital in San Antonio.

We waited 40 minutes for a helicopter to arrive[.]

When I arrived at the hospital, the doctors had given [my daughter] an IV. . . . They gave her a lot of antibiotics and iron.  They said she had a bacterial infection in her lungs.  After three days of the medicine she was back to eating and playing normally[.] . . .

I believe that if [my daughter] had been able to take her whole course of antibiotics earlier she would not have had to be taken to the hospital, and especially not by helicopter.

74.     A volunteer who worked at Dilley in late 2017 said that she "was struck by how many sick children there were," and reported that the medical center was filled with young children who were coughing, sneezing, and lethargic.  Many children had high fevers, conjunctivitis, serious diarrhea, and nausea.  Other children had rashes as a result of drinking

contaminated tap water.  This volunteer noted that the children's "obvious medical problems" did not appear to be receiving adequate medical attention.  Among other things, mothers told her that clinic staff failed to conduct physical examinations, failed to communicate about symptoms and diagnoses, made illogical and incorrect diagnoses of patients, and prescribed water instead of medicine.

75.     Other mothers who spoke to CARA in 2017 reported numerous delays, mistakes, and questionable treatment decisions by Dilley medical staff.  One mother told CARA that medical staff gave her four-year-old daughter six vaccinations in one appointment just days after her daughter had gotten over a bout of fever, vomiting, and diarrhea.  Within hours of receiving the vaccinations, the girl was feverish and vomiting again; a doctor at the clinic subsequently told the mother that her *four-year-old* daughter was presenting symptoms of bulimia.

76.     A male guard berated another mother for trying to pick up acetaminophen from the pharmacy for her four-year-old son, who had a fever, after her 8:00 p.m. curfew.

77.     A third mother said medical staff at the clinic told her that her two-year-old's 104-degree fever and shortness of breath were "normal symptoms that children have when they arrive in a new country."

78.     In addition to collecting declarations from mothers about inadequate care provided to their children at Dilley, members of the CARA Pro Bono Project have sent dozens of emails to ICE expressing concerns about inadequate medical care for both children and adults jailed at Dilley.

79.     The American Immigration Council, the American Immigration Lawyers Association, and the Catholic Legal Immigration Network also recently wrote to the U.S. Department of Homeland Security's Officer for Civil Rights and Civil Liberties and Acting

Inspector General to note their concerns about an alarming increase in the number of infants held at Dilley given the facility's lack of specialized medical care, lengthy delays in receiving medical attention, and lack of appropriate follow-up treatment.[31]

80.     Major medical professional organizations have likewise publicly condemned the medical treatment and conditions at Dilley and other family detention facilities.  The American Academy of Pediatrics wrote to the Secretary of DHS in 2015 "to express [its] concerns for the health and well-being of children and mothers who are being detained in family detention centers in Texas and Pennsylvania."  The organization "question[ed] whether the existing family detention facilities are capable of providing generally recognized standards of medical and mental health care for children." [32]

81.     In 2018, the American Academy of Pediatrics, the American College of Obstetricians and Gynecologists, and the American Academy of Family Physicians wrote to ICE to protest a policy change allowing ICE to place pregnant women in family detention at Dilley and other facilities despite the lack of adequate medical care at those facilities.  The organizations stated:  "It has been documented that while in immigration detention facilities, pregnant women and adolescents experience poor access to medical care. . . . Pregnant women and adolescents should have access to high levels of care, care that is not available at these

---

[31] Letter to DHS Officer for Civil Rights and Civil Liberties and Acting Inspector General from American Immigration Council, American Immigration Lawyers Association, and Catholic Legal Immigration Network, Inc. (Feb. 28, 2019), available at http://americanimmigrationcouncil.org/sites/default/files/general_litigation/complaint_urges_immediate_release_of_infants_from_immigration_detention.pdf.
[32] Letter to DHS Secretary Jeh Johnson from the American Academy of Pediatrics (July 24, 2015), available at https://www.aap.org/en-us/advocacy-and-policy/federal-advocacy/Documents/AAP%20Letter%20to%20Secretary%20Johnson%20Family%20Detention%20Final.pdf.

facilities.  The conditions in DHS facilities are not appropriate for pregnant women or

children."[33]

82.     Most recently, two physicians who have served as "subject-matter experts" for

DHS's Office of Civil Rights and Civil Liberties wrote to the Senate's Whistleblower Protection

Caucus to alert them to grave health and safety hazards to children at Dilley and other family

detention facilities.  The doctors based their letter on ten studies of family detention facilities that

they had conducted over four years.  Among the problems they reported at Dilley were:

- "Dilley, a facility that was supposed to be designed for family detention, lacked sufficient medical space resulting in the use of a gymnasium for medical overflow."

- "Dilley has had difficulty sufficiently staffing enough pediatricians.  Dilley was never able to hire a child and adolescent psychiatrist."

- "HQ and facility staff at Dilley failed to develop an adequate plan for typical parenting challenges like two year old's biting or hitting peers and instead placed toddlers (with parent) in medical isolation for days.  This practice is abusive[.]"

- "[A]t Dilley, an IHSC nurse (Health Services Administrator) deployed a vaccination program without the approval of and during the absence of the Clinical Medical Authority and medical director, a pediatrician.  The program resulted in the vaccination of numerous children with the incorrect dose of vaccine (adult doses were given) because none of the providers were familiar with the labels and markings of pediatric vaccines."[34]

83.     The doctors told the Whistleblower Protection Caucus that they had already filed

a complaint with the DHS Inspector General and communicated with the director of the Office of

Civil Rights and Civil Liberties, "but because we are concerned that the practice of incarceration

---

[33] Letter to Thomas Homan, Acting Director of ICE, from medical professionals (Mar. 30, 2018), available at https://www.aila.org/infonet/medic-professionals-against-ice-deten-policies (emphasis added).
[34] Letter from Dr. Scott Allen and Dr. Pamela McPherson to Senators Charles E. Grassley and Ron Wyden, July 17, 2018, available at https://www.wyden.senate.gov/imo/media/doc/Doctors%20Congressional%20Disclosure%20SWC.pdf.

continues . . . we are reaching out to you. . . . [W]e have an ongoing duty to do whatever is necessary to prevent further harm to children and their families."

84.     On information and belief, guards and other CoreCivic personnel at the Dilley facility were aware that the detainees received inadequate medical treatment.  CoreCivic personnel observed Mariee and other children suffering from deteriorating health conditions, and heard the complaints of mothers that their children had not received adequate care.  CoreCivic personnel were aware of detainees going to the clinic to wait all day to be seen, and being forced to leave when, at the end of the day, no one had seen them.

85.     On information and belief, none of these CoreCivic employees reported or rectified these conditions, despite CoreCivic's obligation under the contract to ensure the proper care of detainees and compliance with Texas licensing requirements.

### D.     CoreCivic's Neglect and Indifference Cause the Preventable Death of Ms. Juárez's One-Year-Old Daughter

86.     On or around March 1, 2018, Ms. Juárez, a Guatemalan citizen, and her then-19-month-old daughter Mariee crossed the Rio Grande into southern Texas.  Ms. Juárez had fled Guatemala to seek asylum in the United States with Mariee because she feared for her and Mariee's life and safety in Guatemala.

87.     Mother and daughter were apprehended shortly after they crossed the border, temporarily detained at a U.S. Customs and Border Patrol immigration processing center, and transferred to Dilley four days later.

88.     When she arrived in the United States, Mariee was a normal, healthy, happy child. She had never suffered from any significant medical problems or chronic medical conditions. The medical personnel who processed Mariee for intake at Dilley on March 5, 2018 did not observe any current illnesses or health problems before admitting her into custody.

89.     Upon Ms. Juárez and Mariee's arrival at Dilley, officers assigned them to a small room with five other mothers, each with a child.  Several children were sick.

90.     One small boy around Mariee's age was visibly ill and very lethargic.  He had a constant cough and runny nose, and his mother said he had fallen ill at Dilley.  She had sought medical care for her son, taking him to the clinic very early in the morning, but the clinic staff sent them back to the housing area without being seen.

91.     Within a week, Mariee developed similar upper respiratory symptoms, including congestion and a productive cough.

92.     On March 11, 2018, a physician assistant examined Mariee, noting "no [history] of acute or chronic medical illnesses" and describing Mariee's general appearance as "well developed" and "well nourished."  But Mariee also had a cough, congestion, runny nose, and "red and swollen turbinates" (soft tissue on the side walls of the nasal cavity).  The physician assistant diagnosed Mariee with an acute upper respiratory infection and prescribed Tylenol for comfort.  The medical record also indicates that the physician assistant prescribed honey packs for cough and directed a follow-up in "6 months."

93.     The next day, March 12, 2018, Ms. Juárez again sought medical attention for Mariee, who was then refusing food, running a fever of 104.2 degrees, and suffering from cough, congestion, diarrhea, and vomiting.  Another physician assistant diagnosed an ear infection, for which he prescribed Augmentin (an antibiotic), and acute bronchiolitis, for which he prescribed fever reducers and oral hydration.  Concerned about Mariee's respiratory symptoms, Ms. Juárez asked the physician assistant to conduct additional examinations.  But the physician assistant merely instructed Ms. Juárez to return to the clinic if Mariee's symptoms worsened, scheduled a follow-up in two days, and sent mother and daughter back to the housing area.

94.     In the subsequent days, Mariee's fever decreased somewhat, but she could not hold down the Augmentin prescribed for her ear infection.  Her breathing problems significantly worsened, and she continued to have diarrhea.  Ms. Juárez sought medical attention for Mariee multiple times but was often left waiting for many hours, including at least two instances where clinic staff turned her away and told her to wait for an appointment on another day.

95.     The clinic waiting area, resembling a gymnasium, was filled with dozens of mothers and children standing in line to be seen.  The facility had no separate area to isolate sick children from healthy ones, nor did the staff provide protective masks to guard against contagion. When Ms. Juárez and Mariee did get in to see medical staff, the appointments often lasted just minutes, and Ms. Juárez believed that medical staff did not address her concerns about Mariee's deteriorating condition.  Ms. Juárez's experience echoes the accounts of parents who for many years have complained about extended waits and cursory examinations from medical staff.  *See supra* ¶¶ 22, 61-77.

96.     By March 15, 2018, when Mariee was next able to see a physician assistant, the little girl had lost two full pounds—nearly eight percent of her body weight—in the ten days since arriving at Dilley.  She continued to suffer from fever, congestion, cough, upset stomach, and very poor appetite.  The physician assistant noted an "upper respiratory infection" and directed Ms. Juárez to continue with Tylenol and Pedialyte, and to follow up in one week.

97.     Mariee's fever worsened.  On March 21, 2018, she presented with a 103.3-degree temperature, an elevated respiratory rate, and a rapid heart rate, as well as a cough, congestion, sneezing, and runny nose.  The physician stated that Mariee had "no trachypnea" [abnormally rapid breathing], even though respiratory rate on the same form showed otherwise.  The

physician diagnosed acute viral bronchiolitis, and prescribed Pedialyte, ibuprofen for fever, Zyrtec for runny nose, and Vicks VapoRub for congestion.

98.     These prescriptions were typical of the substandard, ineffectual treatments prescribed at Dilley for a panoply of symptoms, including ailments for which such medications are contraindicated.  For example, as any pediatrician should know—and as the product's label and website clearly warn—children under two years old should not use Vicks VapoRub because it contains camphor, which can cause respiratory distress in small children, particularly if the child's airways are already inflamed.

99.     After ordering the use of a medicine contraindicated for patient as young as Mariee, the physician directed Ms. Juárez to follow up again in one week, or to return if Mariee respiratory symptoms worsened.

100.    Two days later, on March 23, 2018, Ms. Juárez once again brought Mariee to the clinic, reporting that the child had been coughing and vomiting clear liquid.  Mariee was also suffering congestion, nasal discharge, a borderline oxygen saturation of 96 percent, an elevated heart rate, and a temperature of 99.2 degrees.  Her examination revealed "red sclera," which indicates an adenovirus, though the registered nurse made no note of that possible cause.  Again, the nurse's failure to properly diagnose Mariee's illness followed a pattern all too common at Dilley.  *See supra* ¶¶ 22, 61-83.

101.    By this time, Mariee had been ill with a cough for nearly two weeks and had barely regained any weight.  Ms. Juárez asked the registered nurse to conduct a more detailed examination, particularly of Mariee's lungs.  After listening to Mariee's lungs, the registered nurse returned mother and daughter to the housing area, noting that "a referral would be made

for [Mariee] to see a provider." But ICE discharged Ms. Juarez and Mariee the next day, and they left Dilley two days later never having seen another medical provider.

102.   Over those two days, Mariee's condition deteriorated rapidly. She had constant diarrhea and a fever, vomited frequently, and had difficulty sleeping or eating. On March 24, 2018, Ms. Juárez was notified of an appointment for Mariee to be seen at 8:00 a.m. the next morning. But that appointment never happened. Instead, at 5:00 a.m. on March 25, 2018, Dilley staff took Ms. Juárez and Mariee to a staging area to be processed for transfer out of family detention and for a flight to New Jersey. Ms. Juárez and Mariee (who was still vomiting) waited there until noon, when they were taken to another location at Dilley, fed lunch, and put in a van to San Antonio International Airport. No medical personnel examined Mariee to clear her for travel.

103.   Although no medical personnel saw Mariee on the last day of their departure from Dilley, ICE medical records falsely state that, on March 25, 2018, a "licensed vocational nurse" conducted a "Transfer Summary" before mother and daughter were released and "medically cleared" Mariee for release from Dilley.

104.   This report was fabricated. No licensed vocational nurse (nor anyone else) actually examined Mariee that day.

105.   Even if the licensed vocational nurse actually had conducted an examination that day, she was not qualified to "medically clear[]" Mariee for release, and doing so exceeded the scope of her license. Under Texas law, licensed vocational nurses cannot perform comprehensive patient assessments, initiate any nursing care plan, or implement or evaluate patient care.

106.    The record from Mariee's March 23 appointment—just two days earlier—
indicated that Mariee was acutely ill and needed to see a physician.  But under the heading
"History of Present Illness," the licensed vocational nurse's March 25 "Transfer Summary"
contains no indication that she was coughing and wheezing, that she had lost a substantial
percentage of her body weight, or that she had suffered intermittent high fevers over a prolonged
period.  Instead, without even seeing Mariee, but purporting to have done so, the licensed
vocational nurse answered the questions in the clearance form as follows:

> Is there any medical / dental / or mental health reasons for restricting the
> length of time the alien can be on travel status?  *No*
>
> Are there any restriction [sic] or special equipment required for travel?  *No*
>
> Is a medical escort required?  *No*
>
> Are any transmission-based precautions required during transport?  *No*
>
> Additional comments?  *None*

107.    Ms. Juárez and Mariee boarded a late afternoon flight with a connection to New
Jersey.  Marie slept for most of the flights but vomited in the last hour.  A fellow passenger
commented to Ms. Juárez that Mariee looked very unwell and needed to see a doctor.

108.    By the time Ms. Juárez and Mariee arrived in New Jersey after midnight, early in
the morning of March 26, 2018, Mariee's condition was dire.  Shortly after sunrise on March 26,
Ms. Juárez took Mariee to a pediatrician.  After several hours, the pediatrician sent Ms. Juárez
and Mariee home with additional medications and instructions to seek emergency medical
attention if Mariee's condition deteriorated further.

109.    But by then it was too late.  That same evening, Ms. Jaurez rushed Mariee to the
emergency room, where she was admitted with acute respiratory distress and a critically low
blood oxygen level of 85 percent, requiring continuous supplemental oxygen.  Shortly after

admission, the hospital moved Mariee to the Special Care Unit with a diagnosis of viral
bronchiolitis versus pneumonia.  She tested positive for adenovirus and parainfluenza 3.  Over
the next six weeks, Mariee was transferred to two different hospitals for increasingly specialized
care due to her progressive respiratory failure, requiring painful treatments, including a ventilator
and later an advanced life support device (ECMO), used in dire situations.

110.     Mariee's condition steadily worsened, and she died on May 10, 2018, following a
catastrophic intrathoracic hemorrhage that resulted in irreversible brain and organ damage with
no hope of survival.  The cause of death was identified as bronchiectasis, pulmonitis, and
pneumothorax (collapsed lung).

111.     In the final six weeks of Mariee's life, Ms. Juárez watched as her daughter
suffered extreme physical and emotional pain.  Mariee was hospitalized continuously,
surrounded by multiple medical personnel performing painful tests and examinations.  She was
often chemically paralyzed and sedated.  She had multiple intravenous (IV) lines that needed to
be replaced frequently, an arterial IV line for monitoring her blood gasses, a naso-gastric for tube
feedings, intravenous nutritional supplementation, and a urinary catheter.  While ventilated, she
could not speak.  While sedated and on paralytic drugs, along with all of the IV lines, she could
not hug her mother or be held.

112.     All the medical measures could not stem Mariee's continued deterioration, and
the doctors even considered a lung transplant.  In the last few hours of her life, following the
catastrophic hemorrhage, Marie experienced a chest tube insertion, replacement of the advanced
life support device, massive blood transfusions, and CPR on her tiny body.

113.     On the day her daughter died, Ms. Juárez left the hospital with only an ink print of
Mariee's right hand, made the day before as a Mother's Day gift.

## CAUSES OF ACTION

### COUNT I
### TEXAS SURVIVAL STATUTE: NEGLIGENCE AND GROSS NEGLIGENCE
(Tex. Civ. Prac. & Rem. Code § 71.021, *et seq*.)

114.    Plaintiff incorporates by reference the allegations contained in paragraphs 1-113 of this Complaint as if set forth fully herein.

115.    Ms. Juárez is the surviving mother of Mariee, and she is the legal representative and an heir of Mariee's estate.  Ms. Juárez brings this action for the benefit of all beneficiaries entitled to recover under the Texas Survival Statute, Tex. Civ. Prac. & Rem. Code § 71.021, et seq., by reason of Mariee's death.

116.    As the contractor that assumed responsibility for the management and day-to-day operations of the Dilley detention facility, CoreCivic had at all relevant times a duty to maintain safe and sanitary conditions at Dilley, including to ensure safe and sanitary conditions appropriate for small children detained at the facility.

117.    At all relevant times, CoreCivic also had a duty to ensure that those detained at Dilley, including small children, received adequate access to medical care that adhered to the standards of pediatric medical care.

118.    CoreCivic breached these duties by (1) failing to ensure safe, sanitary, and humane conditions at Dilley, including safe and sanitary conditions appropriate for small children; (2) failing to ensure that families and children detained at Dilley received adequate access to medical care; and (3) failing to address repeated reports and complaints of inadequate medical care at Dilley.

119.    As a direct and proximate result of CoreCivic's negligent, grossly negligent, and reckless acts, omissions, and conduct, Mariee Camyl Newberry Juárez contracted a likely common and treatable upper respiratory illness and suffered avoidable complications of this

33

respiratory illness that CoreCivic allowed to progress until they were irreversible and ultimately fatal. CoreCivic's negligence, gross negligence, and recklessness also caused Mariee to suffer extreme and extended physical, mental, and emotional pain and distress and death.

120.   Had she lived, Mariee would have been entitled to bring an action against CoreCivic for the injuries it inflicted on her.

**COUNT II**
**TEXAS WRONGFUL DEATH ACT: NEGLIGENCE AND GROSS NEGLIGENCE**
**(Tex. Civ. Prac. & Rem. Code § 71.001, *et seq*.)**

121.   Plaintiff incorporates by reference the allegations contained in paragraphs 1-113 of this Complaint as if set forth fully herein.

122.   Ms. Juárez is the surviving mother of Mariee, and she brings this action for the benefit of all beneficiaries entitled to recover under the Texas Wrongful Death Act, Tex. Civ. Prac. & Rem. Code §§ 71.001, et seq., by reason of Mariee's death.

123.   CoreCivic, a private, for-profit prison corporation, is a "person" within the meaning of the Texas Wrongful Death Act.

124.   As the contractor that assumed responsibility for the management and day-to-day operations of the Dilley detention facility, CoreCivic had at all relevant times a duty to maintain safe and sanitary conditions at Dilley, including to ensure safe and sanitary conditions appropriate for small children detained at the facility.

125.   At all relevant times, CoreCivic also had a duty to ensure that those detained at Dilley, including small children, received adequate access to medical care that adhered to the standards of pediatric medical care.

126.   CoreCivic breached these duties by (1) failing to ensure safe, sanitary, humane conditions at Dilley, including safe and sanitary conditions appropriate for small children;

(2) failing to ensure that families and children detained at Dilley received adequate access to medical care; and (3) failing to address repeated reports and complaints of inadequate medical care at Dilley.

127.    As a direct and proximate result of CoreCivic's negligent, grossly negligent, and reckless acts, omissions, and conduct that caused her daughter's death, Ms. Juárez suffered extreme mental and emotional pain and distress, as well as loss of love, companionship, support, enjoyment of life, and other benefits that would have been provided by Mariee, in an amount to be proved at the time of trial.  Ms. Juárez has also incurred reasonable and necessary expenses for Mariee's funeral, burial, and memorial services, as well as for Mariee's medical care in the months leading up to her death.

128.    Mariee would have been entitled to bring an action against CoreCivic for the injuries it inflicted on her if she had lived.

<strong>JURY DEMAND</strong>

129.    Ms. Juárez requests a trial by jury on all issues so triable.

<strong>CONCLUSION AND PRAYER</strong>

For the foregoing reasons, Plaintiff Yazmin Juárez Coyoy respectfully requests that the Court enter a judgment against Defendant CoreCivic, Inc. for the following:

    a.    Actual damages;

    b.    Exemplary damages;

    c.    Costs of court;

    d.    Prejudgment and postjudgment interest; and

    e.    All other relief, in law or equity, to which Ms. Juárez is entitled.

Dated:  July 31, 2019.

Respectfully submitted,

By:  */s/ Christopher M. Odell*
Christopher M. Odell
Texas Bar No. 24037205
Amanda S. Thomson
Texas Bar No. 24082376
ARNOLD & PORTER
   KAYE SCHOLER LLP
Bank of America Center
700 Louisiana Street, Suite 4000
Houston, Texas 77002
Telephone:  713.576.2400
Facsimile:  713.576.2499
christopher.odell@arnoldporter.com
amanda.thomson@arnoldporter.com

R. Stanton Jones*
Robert N. Weiner*
Sally L. Pei*
Daniel F. Jacobson*
ARNOLD & PORTER
   KAYE SCHOLER LLP
601 Massachusetts Ave. NW
Washington, DC 20001
stanton.jones@arnoldporter.com
robert.weiner@arnoldporter.com
sally.pei@arnoldporter.com
daniel.jacobson@arnoldporter.com

*Motions for admission *pro hac vice* forthcoming

**COUNSEL FOR PLAINTIFF**
**YAZMIN JUÁREZ COYOY, ON HER OWN**
**BEHALF AND AS SURVIVING PARENT OF**
**MARIEE CAMYL NEWBERRY JUÁREZ**