**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **YAZMIN JUÁREZ COYOY, on her own** | ) | |
| **Behalf and as Surviving Parent of** | ) | |
| **Mariee Camyl Newberry Juárez,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **V.** | ) | **CIVIL ACTION NO. SA-19-CA-00916-FB** |
| | ) | |
| **CORECIVIC, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## ORDER REGARDING MOTIONS FOR SUMMARY JUDGMENT

Before the Court are Defendant CoreCivic, Inc.'s Motion for Summary Judgment (docket no. 95) on all plaintiff's claims, Plaintiff Yazmin Juárez Coyoy's Motion for Partial Summary Judgment (docket no. 96) on her negligence per se theory of recovery, along with responses and replies filed by the parties. CoreCivic Inc.'s response to plaintiff's motion for partial summary judgment contains a cross-motion for summary judgment on plaintiff's negligence per se claims. (Docket no. 100). After careful consideration, the Court is of the opinion that plaintiff's motion for partial summary judgment and CoreCivic Inc.'s motion for summary judgment should be denied, and CoreCivic Inc.'s cross-motion for summary judgment on plaintiff's negligence per se theory of recovery should be granted.

### I. Overview

Plaintiff, a migrant from Guatemala, alleges her twenty-one-month-old daughter "Mariee died from an entirely preventable and treatable illness that she contracted in crowded, cramped conditions with many other sick children" at the South Texas Family Residential Center ("STFRC") in Dilley, Texas. (Docket no. 1 at pages 2-3). STFRC is a 2,400-bed detention facility for migrant families and children in the custody of U.S. Customs and Immigration Enforcement ("ICE"). The City of Eloy, Arizona, served as the general contractor for the project and the defendant CoreCivic, Inc.

("CoreCivic") was one of its subcontractors.  CoreCivic's scope of work included constructing and operating the facility.  Healthcare services were provided by ICE medical staff.

Plaintiff came to the United States with her daughter, Mariee, seeking refugee status.  (Docket no.1 at para 21).  She crossed the Mexico-United States border with Mariee into Texas on March 1, 2018.  (Docket no. 1 at para 24).  That same day, U.S. Customs and Border Patrol ("CBP") agents apprehended the pair and transported them to a CBP holding facility in McAllen, Texas.  (*Id.*).  Four days later, plaintiff and Mariee were transferred into ICE custody at STFRC in Dilley.  (*Id.*).  They were detained at STFRC from March 5th until March 25th, 2018.  (*Id.* at para 30-32). .

Plaintiff contends CoreCivic provided unsafe and unsanitary living conditions to Mariee while she was at STFRC, which resulted in Mariee falling ill with the infection that ultimately led to her death.  (Docket no. 1 at para 5).  She specifically alleges CoreCivic assigned them to crowded and cramped living quarters, with at least one visibly sick child who slept near Mariee.  *See* (*id.* at para 6-7, 90).  Plaintiff states that Mariee developed the same upper respiratory symptoms as the boy within a week of being housed at STFRC.  (*Id.* at para 91).

On March 11, 2018, a physician assistant examined Mariee, diagnosed her with an acute upper respiratory infection, and prescribed Tylenol for comfort and honey packs for her cough. (*Id.* at para 92). That physician assistant directed a follow-up in 6 months. (*Id.*). The next day, Mariee was running a fever of 104.2 degrees and refusing food, as well as suffering from cough, congestion, diarrhea, and vomiting. She was seen by another physician assistant, who prescribed an antibiotic, fever reducers, and oral hydration. (*Id.* at para 96).

Three days later, another physician assistant diagnosed an upper respiratory infection, directed continued administration of medications, and scheduled a follow up appointment for a week later. (*Id.*). On March 21, 2018, a physician diagnosed Mariee with acute viral bronchiolitis, and prescribed more

medication.  (*Id*. at para 97).  Finally, on March 23, 2018, a nurse examined Mariee's lungs and noted that a referral would be made for her to see a medical provider. (*Id*. at para 100).

On March 25, 2018, ICE staff cleared plaintiff and Mariee for transfer out of family detention to New Jersey, despite Mariee's not having been medically examined that day. (*Id*. at para 103).  The two boarded a plane to New Jersey. (*Id*. at para 107.) Soon after landing, plaintiff took Mariee to a pediatrician, and then took her to an emergency room. (*Id*. at para 108).  Mariee tested positive for viral bronchiolitis versus pneumonia.  (*Id.* at para 109).

After six weeks of treatment at two different hospitals, Mariee died on May 10, 2018. (*Id*. at para 110).   The medical examiner concluded that the cause of death was "acute respiratory failure with hypercapnia," for which the principal underlying conditions included "adenovirus" and "parainfluenza." (Docket no. 101, Ex. H).

Plaintiff filed three lawsuits seeking compensation for Mariee's death.  The first, filed on February 28, 2019, was styled *Yazmin Juarez Coyoy v. City of Eloy*, *Arizona*, Civil Action No. 19-01391 (D. Ariz. 2019).  In that suit, plaintiff asserted the City of Eloy's role as primary contractor gave it a duty of care.  The dismissal of that case was affirmed by the United States Court of Appeals for the Ninth Circuit in 2021.  *Coyoy v. City of Eloy*, 859 F. App'x 96 (9th Cir. 2021).

The second case, filed on July 31, 2019, is this case.  Plaintiff brings four claims under Texas state law against CoreCivic, the private contractor which operated STFRC, the ICE detention facility where Mariee allegedly became ill.  Her claims are for negligence and gross negligence under the Texas Survival Statute and the Texas Wrongful Death Act.  This case initially included medical negligence claims against ICE staff, which were dismissed on October 9, 2019.  (Docket no. 19).  The sole issue remaining is a claim that CoreCivic negligently created unsafe, unsanitary housing conditions which proximately caused the illness which ultimately led to Mariee's death.

The third action is styled *Yazmin Coyoy v. United States*, Civ. No. 20-2501 (KM) (ESK) (D. N.J. 2020). That case contains the remaining claims of negligent medical care at STFRC. It is pending in federal court in New Jersey. *See Coyoy v. United States*, 526 F. Supp. 3d 30 (D.N.J. 2021) (concluding "that Ms. Juarez is a resident of the District of New Jersey, and that venue is therefore proper here.")

Now before this Court are CoreCivic's motion for summary judgment and plaintiff's motion for partial summary judgment. CoreCivic moves for judgment as a matter of law on all plaintiff's claims arguing: (1) plaintiff lacks standing and legal capacity to bring survival clams on behalf of Mariee's estate, (2) CoreCivic is a federal contractor entitled to derivative immunity against plaintiff's negligence and gross negligence claims, and (3) plaintiff cannot establish CoreCivic was negligent or grossly negligent. Plaintiff argues she is entitled to partial summary judgment on the issues of negligence per se and gross negligence per se because CoreCivic housed Mariee in half the physical space required by Texas law. Responses and replies have been filed and the issues are ripe for review.

## II. Background

Prior to their detention at STFRC, in September 2017, plaintiff contacted to a friend for help, stating that she was in Mazate, Guatemala, and wanted to take Mariee to see a "pneumologist because of the cough she has . . . ." (Docket no. 95, Ex. B, plaintiff's Facebook messages). Then, on approximately February 22, 2018, plaintiff, her brother, and Mariee left Guatemala and traveled to Mexico City. From there, they traveled through Mexico for nine days, stopping at various hotels, before reaching the United States.

On or around March 1, 2018, the pair arrived at the United States Border, where "there were lots of people [waiting] to cross the river, and they were being divided into groups" of nine to cross on inflatable rafts. (Docket no. 95, Ex C, plaintiff's dep. at 23:22-24:6). After crossing the river, they were apprehended by United States Customs and Border Protection ("CBP") and placed in a vehicle with a

man and his son, who appeared to be around five-years old.  They were driven to a CBP processing center about an hour away (in McAllen, Texas) and placed in "a room with lots of people in it." (*Id*. at 29:8–30:5; 34:10–11).[1]  Plaintiff described the room as a large "cage," where there were approximately 30 or more individuals, but each person "had their space." (*Id*. at 32:2–16, 33:8). Plaintiff further described the room as an "icebox" because it was "very cold," and that there were a lot of children—more than 20. (*Id*. at 34:12–35:3).  She said people slept on the floor because there were no beds. (*Id*. at 33:9–11).  Plaintiff and Mariee were detained in that room for 3 days.

On March 5, 2018, Plaintiff and M.J. were transferred to ICE custody and assigned by ICE to STFRC.  According to the complaint, "Mariee was a normal, healthy, happy child when she arrived in the United States, who never suffered from any significant medical problems or chronic medical conditions." *See* (Docket no. 1 at para 26).  ICE medical personnel who processed Mariee for intake at STFRC on March 5, 2018,  did not observe any current illnesses or health problems before admitting her into custody. (Docket no. 101 at page 21) (Exhibit N) (Mariee's intake medical records).

Plaintiff alleges "upon Ms. Juárez and Mariee's arrival at Dilley, officers assigned them to a small room with five other mothers, each with a child" and "several children were sick." (Docket no. 1 at para 89).  Plaintiff contends "[o]ne small boy, around Mariee's age, was visibly ill and very lethargic." (*Id.* at 90).  He allegedly "had a constant cough and runny nose," and his mother said he had fallen ill at STFRC. (*Id.*).

Plaintiff further contends the mother also said [s]he had sought medical care for her son, taking him to the clinic very early in the morning, but the clinic staff sent them back to the housing area without being seen." (*Id*.) She alleges that, "within a week, Mariee developed similar upper respiratory symptoms" similar to those suffered by the boy, "including congestion and a productive cough." (*Id.*

---

[1]CoreCivic does not own, operate, or manage the CBP processing center.

at para 91).  Plaintiff admits she did not file a formal grievance, but contends she reported the sick boy

to a CoreCivic employee to no avail.  (Docket no.  101 at page 13) (citing Y. Juárez Tr. At 55:15-18).

CoreCivic assigned plaintiff and Mariee to Yellow Frog Complex #3, Room 124.  This suite,

like all the others, contained 6 bunk beds for a maximum occupancy of 12 detainees.  During the period

from March 5, 2018 through March 25, 2018, their assigned suite was at full capacity housing 6 mothers

and 6 children, with the exception of only the last 2 days, when there were 10 individuals in the suite.

(Docket no. 95, Ex. B, Conry Dep. at 142:18–23) ("Q. Okay. So for that entire period, March 5th to

25th, this suites, all six bunk beds were fully occupied every single day with the exception of the last

two days that plaintiff and her daughter were there when there was one bunk bed empty, right? A.

Yes.").  As noted, plaintiff alleges the suite was crowded and cramped, and occupied by at least one sick

child, and that these unsafe and unsanitary living conditions caused Mariee to fall ill with the infection

which ultimately resulted in her death.  (Docket no. 1 at para 6).

### III.  Building and Operating Requirements

CoreCivic built and operated STFRC pursuant to an agreement between ICE and the City of

Eloy, Arizona.  That agreement contained a "Performance Work Statement" that describes the

equipment, personnel, and services, including bed space, that CoreCivic (identified as the "Service

Provider") was required to provide at the STFRC.  The Performance Work Statement required

CoreCivic to take steps to comply with residential licensing requirements under Texas law.

Specifically, it required CoreCivic to "seek licensing from the State agency responsible for residential

programs that house juveniles (and family groups if applicable)." (Docket no. 96, Ex. A at 1 § 2).  The

Performance Work Statement further states: "Should [CoreCivic] be unable to secure State licensure,

[CoreCivic] shall nonetheless comply with all substantive requirements for State-licensed residential

care programs and seek application of such requirements to the family residential center by the State."

(*Id.*); *see also* (*id.* at 2 § 4(a)(i)) (similar). The Performance Work Statement similarly incorporated Texas-law licensing requirements in its specific requirements for the "Physical Facility Plant." (*Id.* at at 20 § 5(j)(ii) ("[CoreCivic] shall affirmatively demonstrate through appropriate documentation that all facilities meet all applicable State licensing requirements for residential childcare facilities and adult shelter care facilities . . . ."); *see also* (*id*. at 20 § 5(j)(iii)) ("State-licensing guidelines provide ample instruction on space, privacy, fire, safety, and sanitation requirements."). Thus, CoreCivic was obligated to seek licensure from the relevant state agency; and even if CoreCivic was unable to secure such licensure, it was still subject to Texas-law requirements for residential child care and adult shelter care facilities. *See* (*Id.* at 1, 20 §§ 2, 5(j)(ii)).

## IV.  Minimum Standards for Physical Spacing

In Texas, the state agencies governing requirements for and licensing of residential childcare and adult shelter care facilities are the Texas Department of Family Protective Services ("TDFPS") and the Texas Health and Human Services Commission ("HHSC").[2]  Title 26, Chapter 748, of the Texas Administrative Code contains "Minimum Standards" promulgated by HHSC that govern "General Residential Operations."  Section 748.3357 of that chapter—entitled "[w]hat are the requirements for floor space in a bedroom used by a child?"—provides that "(a) Floor space":

(1) Is space that a child can use for daily activities;

(2) Does not include closets or other alcoves; and

(3) May not be averaged.

---

[2] In February of 2018, the State of Texas enacted House Bill 5, which transferred from TDFPS to HHSC the responsibility for regulating general residential facilities.  43 Tex. Reg. 909.

(b) You must provide comfortable sleeping arrangements that meet one of the following:

(1) A single occupancy bedroom with at least 80 square feet of floor space; or

(2) A bedroom with at least 60 square feet for each occupant and no more than four occupants per bedroom are permitted . . . .

Tex. Admin. Code § 748.3357(a)–(b).

In addition to clarifying that floor space in a bedroom used by a child may not be averaged, Tex. Admin Code § 748.3357(a)(3), Chapter 748 further clarifies that facilities like STFRC "may not use [certain enumerated areas] as bedrooms." *Id.* at § 748.3359(1)(3). These areas include, inter alia, "[r]ooms commonly used for other purposes, such as dining rooms, living rooms, hallways, porches or dens," and "[r]ooms that are passages to other rooms." *Id.* § 748.3359(1)–(3).

Chapter 748 also provides that an ICE "family residential center," like STFRC, "is a general residential operation (GRO) and must comply with all associated requirements for GROs, unless the family residential center is approved for an individual waiver or variance or an exception is provided to this section." *Id.* at § 748.7(b). To this end, ICE facilities like STFRC are exempt from "the limitation of room occupants to four in § 748.3357 of this title [*i.e.,* "What are the Requirements for Floor Space in a Bedroom Used by a Child?")]," as long as they obtain a "variance or waiver to be exempted" from the "fewer than 60 square feet per child" requirement." *Id.* at § 748.7(c)(1).

<u>V.  Physical Spacing at STFRC</u>

Specific to STFRC, and under the Performance Work Statement, CoreCivic was required to provide temporary residential services in a safe and secure environment for up to 2,400 residents, in compliance with section 748.3357. STFRC is divided into 5 "neighborhoods," each identified by a different color animal, including the "Yellow Frog" neighborhood where plaintiff and Mariee were housed. (Docket no. 96 at Ex B, 67:21-32). Each neighborhood was divided into 4 "complexes," with each complex containing 10 separately-numbered living quarters called "suites."

The suites were 32 by 23 feet and 8 inches, for a total of 757.33 square feet. Each suite contained 6 bunk beds (12 beds in total) and housed up to 12 residents, 6 mothers and 6 children. There were 2 "sleeping room[s]"—each 173 square feet in size—with 3 bunk beds to sleep 3 mothers and 3 children. (Docket no. 96, Exhibit D). In addition, each suite contained a 120-square-foot "study area" and a 241-square-foot "living area." (*Id.*)

As CoreCivic notes, "excluding various components of the space, such as walls, the total living area of each suite was approximately 722 square feet, thus providing at least 60 square feet of space per resident," (*i.e.*, $722 \div 12 = 60.16$). However, as plaintiff points out, when one of the bedrooms was at full capacity with 6 occupants, there were 28.83 square feet per occupant, (*i.e.*, $173 \div 6 = 28.83$). That is less than half of the 60 square feet per occupant required by Texas's Minimum Standards.



(Docket no. 96 at Exhibit D).

<u>VI. Licensing Requirements for Residential Detention Facilities</u>

On September 2, 2015, TDFPS was authorized to issue licenses to ICE family residential detention centers such as STFRC. *See Texas Dep't of Fam. & Protective Servs. v. Grassroots*

*Leadership, Inc.*, 2018 WL 6187433, at *2 (Tex. App.–Austin Nov. 28, 2018, pet. filed) ("TDFPS did not attempt to regulate FRCs in Texas until it adopted an emergency rule on September 2, 2015."). While that rule was in effect, CoreCivic applied for a waiver or variance of the 60 square foot per occupant bedroom requirement under section 748.3357 of Texas's Minimum Standards. The 2015 application, signed by Wesley Lee, then the facility administrator at the STFRC, expressly admits that STFRC "does not meet the 60 square feet per child per bedroom" requirement and that CoreCivic is seeking the waiver in order to avoid a "substantial prohibitive cost." (Docket no. 96, Exhibit E). TDFPS denied the variance request in March of 2016 because CoreCivic "requested voluntary closure," but STFRC never actually closed. (*Id.* at Exhibit G).

In a subsequent unsigned application for waiver (provided to plaintiff after the close of discovery by HHSC in response to a subpoena in this case), CoreCivic again requested a variance. (*Id.* at Exhibit F). CoreCivic again admitted it was in violation of the 60 square foot per occupant requirement. It clarified the "estimated cost" to comply was $44,863,398.00 (*Id.* at Exhibit F).

About a month later, on April 21, 2016, CoreCivic withdrew its application for a variance and submitted an "Explanation of Bedroom Floor Space/Square Footage." (*Id.* at Exhibit H). CoreCivic asserted that the bedrooms were "in compliance with section 748.3357(b)(2), which requires 60 square feet for each occupant," because STFRC "ha[s] bedrooms that measure 722 square feet." (*Id*. at 1).

CoreCivic's explanation measured the bedroom to be 722 square feet by adding in the square footage from the non-bedroom areas of the living suite, including the 120-square foot "study area" and the 241-square-foot "living area." Even then, however, the square footage of all these areas totals only 707 square feet, which is still less than 60 square feet per person for 12 occupants ($707 \div 12 = 58.91$). As a result, CoreCivic took the position that the "floor space" in the bedrooms includes "the cabinet and accompanying counter space" next to the sink located in the "living area" and the "horizontal surfaces

atop the bedroom pony walls," which are half walls that separate the bedrooms from the rest of the living quarters. (*Id.*).

With the addition of the "floor space" from the sink countertop/cabinets and the surface along the pony walls—plus the square footage of the entire "living area" and the entire "study area"—CoreCivic maintained that the square footage of the bedrooms equals 722 square feet, which provides 60 square feet per occupant for the maximum 12 occupants. (Docket no. 96, Exhibit H). To support this measurement, CoreCivic concluded that, because section 748.3357(a)(1) defines "floor space in a bedroom" to include "space that a child can use for daily activities," the counter top, sink, and cabinets outside the bedroom and the pony wall surfaces should be considered "floor space" that is part of the "bedroom." (*Id.*).

On June 3, 2016, the *Grassroots* court prohibited TDFPS from issuing a license to STFRC. (Https://www.clearinghouse.net/chDocs/public/IM-TX-0041-0015.pdf). Noting that STFRC had filed an application, however, the state court allowed TDFPS to conduct unannounced state inspections while STFRC's application for a license to operate as an Ice family residential center was pending and prevented CoreCivic from withdrawing its application. (*Id.* at 5-6). During TDFPS inspections of STFRC in July 2017 and October 2017, no deficiencies were found relating to safety, sanitation, or hygiene. (*Id.* at 6). An inspection in January of 2018 also found no such deficiencies, including in the requirements for floor space in a bedroom used by a child pursuant to § 748.3357. (*Id.*).

### VII.  Summary Judgment Standard of Review

Plaintiff brings four claims under Texas state law against CoreCivic. Her claims are for negligence and gross negligence under the Texas Survival Statute and the Texas Wrongful Death Act. Plaintiff moves for partial summary judgment contending CoreCivic was negligent per se as a matter

of law based on its violation of the minimum physical spacing requirement for bedrooms at STFRC. CoreCivic moves for summary judgment on all plaintiff's claims.

Summary judgment is appropriate where the movant demonstrates "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Bazan ex rel. Bazan v. Hidalgo Cnty.*, 246 F.3d 481, 489 (5th Cir. 2001) ("An issue is 'genuine' if it is real and substantial, as opposed to merely formal, pretended, or a sham."). To demonstrate an issue as to material facts, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The nonmoving party must show sufficient evidence to resolve issues of material fact in its favor. *Anderson*, 477 U.S. at 249.

When evaluating a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party. *Id*. at 255. However, it is not incumbent upon the Court to comb through the record in search of evidence that creates a genuine issue as to a material fact. *See Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003). The nonmoving party must cite the evidence in the record that establishes the existence of genuine issues as to the material facts. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  When parties file cross-motions for summary judgment, the Court reviews "each party's motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party." *Ford Motor Co. v. Tex. Dep't of Transp.*, 264 F.3d 493, 498 (5th Cir. 2001) (internal quotations omitted).

VIII.  Discussion

A.  Plaintiff's Motion for Partial Summary Judgment:
Negligence Per Se and Texas's Requirement for Floor Space in a Bedroom Used by a Child

Plaintiff argues she is entitled to summary judgment on the issue of negligence per se because CoreCivic failed to provide Mariee with "a bedroom with at least 60 square feet of space," as required by section 748.3357(b)(2) of the Texas Administrative Code (hereafter "section 748.337(b)(2)"). CoreCivic responds that summary judgment should be granted in its favor because. (1) plaintiff did not plead a negligence/gross negligence per se theory of liability based on a violation of section 748.3357(b)(2), (2) CoreCivic was not required to be licensed when plaintiff and Mariee were detained at STFRC, (3) CoreCivic did not violate the minimum requirements of floor space in a bedroom used by a child, (4)  CoreCivic is entitled to derivative immunity for building the facility at the direction of the federal government and according to its specifications, and (5) the alleged violation of this non-penal administrative rule does not support negligence per se claims.  CoreCivic also points out that plaintiff does not argue or attempt to prove that a violation of section 748.3357(b)(2) proximately caused Mariee's injuries.

B.  Plaintiff's Pleading

Plaintiff's complaint is devoid of any reference to the Texas Administrative Code and section 748.3357(b)(2)'s bedroom floor space requirement, and it does not include an allegation that CoreCivic violated this rule under a negligence per se theory of liability.  CoreCivic argues that federal district courts in Texas Western have dismissed negligence per se claims where the plaintiff fails to identify the specific statute that the defendant allegedly violated—even where the plaintiff affirmatively pleaded "negligence per se" as a separate claim.  *Eyer v. Rivera*, SA-17-CV-01212-JKP, 2019 WL 5543030, at *2 (W.D. Tex. Oct. 25, 2019) ("Because plaintiffs did not cite to any specific statute violated by defendants' alleged conduct, they failed to state a claim of negligence per se"); *Estrada v. Indus.*

*Transit, Inc.*, No. 4:16-CV-013-DAE, 2016 WL 10967300, at *3 (W.D. Tex. Aug. 8, 2016) ("Plaintiff has failed to state a claim for negligence per se because he failed to plead the statute [defendant] allegedly violated."); *see also Watkins v. Cornell Cos., Inc.*, No. 3:11-cv-260-M-BN, 2013 WL 1914713, at *4 (N.D. Tex. Mar. 15, 2013) ("The undersigned need not address section 448.201 of the Texas Administrative Code and section 81.103 of the Texas Health & Safety Code because plaintiffs failed to allege negligence per se under these statutes."), *report and recommendation adopted*, 2013 WL 1926375 (N.D. Tex. May 8, 2013). CoreCivic thus makes a persuasive argument that plaintiff's pleading precludes her from raising negligence per se at this late stage in the proceedings. *See De Franceschi v. BAC Home Loans Servicing, L.P.,* 477 F. App'x 200, 204 (5th Cir. 2012) (explaining that district courts do not abuse their discretion when they disregard claims or theories of liability not present in the complaint and raised for the first time in a motion opposing summary judgment).

Yet, plaintiff points out that the waiver applications upon which she relies heavily in her motion were not produced until December 29, 2021, after the close of discovery. Although plaintiff did not seek to amend her complaint in an effort to assure herself "a fair opportunity to present" her negligence per se claims, "equal attention should be given to the proposition that there must be an end finally to a particular litigation," and CoreCivic has cross-moved for summary judgment on the issue. *See Freeman v. Continental Gin Co.*, 381 F.2d 459, 469 (5th Cir. 1967). Accordingly, in the alternative and out of an abundance of caution, the Court turns to the merits of plaintiff's negligence per se claims.

C.  TDFPS's Authority over STFRC at the Time Mariee was Detained

CoreCivic argues that STFRC was "not subject to TDFPS licensure or regulation" at the time plaintiff and Mariee were detained so there can be no negligence per se based on a violation of section 748.3357. (Docket no. 100 at page 8). The Performance Work Statement governing CoreCivic's operation of STFRC expressly requires that CoreCivic comply with those Texas standards, which

include the minimum requirements for floor space in a bedroom used by a child.  (Docket no. 96, Exhibit A §§ 2, 4(a)(i), 5((j)(ii)-(iii)).   CoreCivic points out that section 748.7 of the Texas Administrative Code was enjoined as of March 2018, but that section merely allowed TDFPS to regulate and license ICE family residential centers.  *See Grassroots Leadership, Inc.*, 2018 WL 6187433, at *2.  The 2017 injunction of section 748.7 upon which CoreCivic relies, which prevented TDFPS from licensing STFRC, did not change the fact that STFRC nonetheless falls squarely within the definition of a "General Residential Operation" under section 748 of the Texas Administrative Code.  *See* Tex. Admin. Code § 748.43(29).  Nor did it change the fact that STFRC was required to comply with Chapter 748's "Minimum Standards for General Residential Operations" under CoreCivic's own Performance Work Statement.  (Docket no. 96, Ex. A §§ 2, 4(a)(I), 5(j)(ii)-(iii)).

D.  The Minimum Requirement for Floor Space: "One Large Room" vs. "Bedroom"

CoreCivic argues that the living suite was just "one large room," but that is belied by its internal documents which specifically designate multiple rooms within the suite, including two rooms labeled "sleeping room[s]"–each 173 square feet in size.  (Docket no. 96, Ex. B at 110:6-15).  CoreCivic's own representative specifically admitted that these a sleeping room was a "bedroom":

Q.      What would you call a room that is labeled "sleeping room" and has only beds and a private area to change your clothes? . . . .

Q.      Would it be fair to call it a sleeping room?

A.      Bedroom.

Q.      Bedroom.  You'd call it a bedroom.  I'd call it a bedroom.  Would you call it a bedroom?

A.      I just said that.

(Docket no. 96, Ex. B at 110:6-15).  Whether they are called sleeping rooms or bedrooms, when these 173 square foot areas were at full capacity with 6 people (as was the case for nearly the entire time

plaintiff and Mariee were at STFRC), they did not meet the minimum requirement of 60 square feet per occupant.  CoreCivic does not argue otherwise.

CoreCivic does argue the waiver request(s) it submitted to TDFPS was based on a purported miscalculation.  However, this ignores the key provisions of the physical spacing requirements under section 748.3357.  CoreCivic asserts that "floor space" counts as "space that a child can use for daily activities" and seems to acknowledge that the space may "not include closets or other alcoves" and "may not be averaged." Tex. Admin. Code § 748.3357(a).  CoreCivic's argument, however, disregards other requirements under chapter 748 providing that "[r]ooms commonly used for other purposes, such as dining rooms, living rooms, hallways, porches or dens" may not be used as bedrooms.  Tex. Admin. Code 748.3359.  This conclusively refutes CoreCivic's contention that the entire living suite, including the other rooms, should count as square feet for purposes of determining whether STRFC met the 60 square feet minimum requirement of floor in the bedroom used by Mariee.

E.  Derivative Immunity: Negligence Per Se

In the event the 60 square feet rule was violated, CoreCivic argues it was a private contractor which built STFRC under ICE's authority and at its specific directions and therefore CoreCivic derives the federal government's immunity against plaintiff's negligence per se claims under *Yearsley v. W.A. Ross Construction Co.,* 309 U.S. 18 (1940), and *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988).  (Docket no. 100 at page 10).  Neither *Yearsley* nor *Boyle* stands for the proposition that CoreCivic can  rely upon ICE's authority and specific directions when building STFRC to bypass its obligation to operate the facility in compliance with the requirements for floor space in a bedroom used by a child under section 748.3357.

Moreover, courts have held that derivative immunity, as discussed in *Yearsley* and *Boyle*, is limited to cases in which a contractor "had no discretion in the design process and completely followed

government specifications." *See In re Hanford Nuclear Reservation Litig.*, 534 F.3d 986, 1001 (9th Cir. 2008) (citations omitted); *see also In re Katrina Canal Breaches Litig.*, 620 F.3d 455, 465 (5th Cir. 2010) (advising that derivative immunity defense under *Yearsley* and *Boyle* is not intended to permit "the government [to] provide general specifications, inform the court that it 'precisely' chose to approve only general specifications, and thus render all subsequent, discretionary decisions of a government contractor protected"); *In re Oil Spill by the Oil Rig Deepwater Horizon*, No. MDL 2179, 2011 WL 4575696, at *4 (E.D. La. Sept. 30, 2011), as amended (Oct. 4, 2011) (clarifying that *Yearsley* and *Boyle* "might apply when 'discretion' is not at issue").  Here, the record does not reflect that CoreCivic "had no discretion" in devising the building plan.  (Docket no. 95 at page 3) (explaining that ICE worked directly with CoreCivic to develop STFRC's design requirements) (citing Exhibit G, Conry Decl., at para 11).  Under these circumstances, CoreCivic has not shown it is entitled to derivative immunity on plaintiff's claims of negligence per se.

F.  Negligence Per Se: Analysis

Having determined that STFRC did not meet the minimum requirement for spacing in a bedroom used by a child and that CoreCivic is not entitled to derivative immunity to avoid compliance, the Court turns to the merits of plaintiff's negligence per se claims.  "Negligence per se is a tort concept whereby the civil courts adopt a legislatively imposed standard of conduct as defining the conduct of a reasonably prudent person." *Moughon v. Wolf*, 576 S.W.2d 603, 604 (Tex.1978); *see also Reeder v. Daniel*, 61 S.W.3d 359, 361–62 (Tex.2001).  "To establish negligence per se, a plaintiff must prove: (1) the defendant's act or omission is in violation of a statute or ordinance; (2) the injured person was within the class of persons which the ordinance was designed to protect; and (3) the defendant's act or omission proximately caused the injury." *Ambrosio v. Carter's Shooting Ctr., Inc.*, 20 S.W.3d 262, 265 (Tex. App.–Houston [14th Dist.] 2000, pet. denied).  Although negligence per se can establish breach

of the standard of care, it "does not establish liability." *Searcy v. Brown*, 607 S.W.2d 937, 941 (Tex. App.–Houston [1st Dist.] 1980, no writ).

Plaintiff seeks summary judgment on her negligence per se claim, but states that "causation is a question of fact for the jury." (Docket no. 96 at page 16). As with ordinary negligence, a plaintiff must show "that such negligence was a proximate cause of the injury or damages sustained." *Id.*; *see also Almanzar v. Eaglestar*, Cause No. EP-20-CV-117-KC, 2021 WL 7184209, at *3 (W.D. Tex. Dec. 21, 2021) ("If a court determines that the statutory or regulatory standard is an appropriate basis for civil liability, then the plaintiff must prove that the defendant violated that standard and that the violation proximately caused the plaintiff's injury."). Because plaintiff has not argued or attempted to establish causation, she cannot show she is entitled to judgment as a matter of law on her negligence per se claim. Her motion for partial summary judgment must be denied on this ground alone.

Corecivic also makes a persuasive argument that § 748.3557(b)(2) is not a penal statute or civil rule with criminal penalties which would subject it to liability under a negligence per se theory of recovery. *See Reeder v. Daniel*, 61 S.W.3d 359, 361-62 (Tex. 2001) ("Negligence per se is the doctrine that allows courts to rely on a penal statute to define a reasonably prudent person's standard of care."); *Ridgecrest Ret. & Healthcare v. Urban*, 135 S.W.3d 757, 762 (Tex. App.–Houston [1st Dist.] 2004, pet. denied) (reversing and remanding for new trial based on finding of prejudicial error resulting from jury instruction based on invalid theory of liability for negligence per se due to assisted living facility's failure to follow sanitary measures in compliance with Texas Administrative Code ); *Pack v. Crossroads, Inc.*, 53 S.W.3d 492, 509-10 (Tex. App.–Fort Worth 2001, pet. denied) (finding plaintiff could not state negligence per se claim based on nursing home's alleged violation of provisions of Texas Administrative Code governing requirements which facility must meet in order to be licensed as a nursing facility and participate in Medicaid program).

As in *Ridgecrest* and *Pack*, plaintiff's negligence per se theory relies on the alleged violation of an administrative rule that is not penal in nature. Section 748.1 of the Texas Administrative Code provides that "[t]he purpose of this Chapter is to set forth rules that apply to General Residential Operations and Residential Treatment Centers." Thus, "chapter 748 only sets forth rules that apply to residential treatment centers through the permit holder, including developing, among other things, written personnel policies that ensure compliance with minimum employee qualifications." *See Dayne v. Texas Dep't of Fam. & Protective Servs.*, No. 13-10-00679, 2011 WL 4998872, at *2 n.3 (Tex. App.–Corpus Christi Oct. 20, 2011, pet denied). Moreover, Title 26, chapter 748 of the Texas Administrative Code contains no enforcement provision and provides only one administrative remedy: a facility may be cited by TDFPS for violating approved plans, policies, or procedures. 26 Tex. Admin. Code § 748.129.[3]

Even presuming Texas's minimum requirements for floor space in a bedroom used by a child could be construed as a penal regulation, plaintiff cannot show that section 748.3357(b)(2) was designed to prevent Mariee's alleged injury. "The threshold questions in every negligence per se case involving a penal statute are whether the plaintiff belongs to the class that the statute was intended to protect and

---

[3] Similar to Texas appellate courts, federal district courts in Texas generally dismiss negligence per se claims based on the alleged violation of non-penal administrative rules or regulations. *See My Clear View Windshield Repair, Inc. v. GEICO Advantage Ins. Co.*, Civil Action No. 4:16-cv-02840, 2017 WL 2591339, at *5 (S.D. Tex. Feb. 14, 2017) ("The Texas Insurance Code section on which plaintiffs rely for their negligence per se claim is not penal in nature. Therefore, it cannot serve as the basis of a negligence per se claim.") (internal citation omitted); *Del Castillo v. PMI Holdings N. Am. Inc.*, Civil Action No. 4:14-CV-03435, 2016 WL 3745953, at *6 (S.D. Tex. July 13, 2016) ("Under Texas law, only the violation of a penal statute can give rise to negligence per se . . . . Of the various administrative rules, regulations, industry standards, and the one federal civil statute that are listed in the Complaint, none . . . [is] penal in nature, and therefore none can serve as the basis of a negligence per se claim."); *In re SMIC, Ltd.*, No. 10-40120-DML-11, 2013 WL 4078704, at *8 (Bankr. N.D. Tex. Aug. 13, 2013) ("Because the Rules of the Texas Real Estate Commission are not penal in nature, they cannot form the basis for a negligence claim."); *see also id.*, at *8 n.31 ("Texas courts have repeatedly held that mere civil and administrative penalties are not penal in nature and cannot form the basis for negligence per se."); *Watkins v. Cornell Companies, Inc.*, No. 3:11-CV-260-M-BN, 2013 WL 1914713, at *3 (N.D. Tex. Mar. 15, 2013) ("The penalties for enforcement of chapter 448 are civil remedies, ranging from license revocation or suspension to administrative penalties. As such, none of the sections in chapter 448 are penal in nature, and therefore none can serve as the basis for negligence per se claim."), *report and recommendation adopted*, No. 3:11-CV-260-M-BN, 2013 WL 1926375 (N.D. Tex. May 8, 2013).

-19-

whether the plaintiff's injury is of a type that the statute was designed to prevent." *Discovery Operating, Inc. v. BP Am. Prod. Co.*, 311 S.W.3d 140, 162–63 (Tex. App.–Eastland 2010, pet denied). Here, plaintiff argues that the 60 square feet bedroom floor space requirement was adopted to ensure that children have sufficient space to physical distance from others. However, CoreCivic presents summary judgment evidence wherein TDFPS explained that its intent was to "permit living arrangements that preserve family units" by allowing an exception to four occupants per room rule while ensuring an outer limit as "necessary to comply with fire standards." *See* https://texashistory.unt.edu/ark:/67531/metapth712779/m2/1/high_res_d/0226is.pdf).

Finally, even if plaintiff's negligence per se claim could survive these questions, CoreCivic presents summary judgment evidence that it fails the five factor test set forth by the Texas Supreme Court. Specifically, as set forth in *Perry v. S.N*, 973 S.W.2d 301, 309 (Tex. 1988), the focus is upon:

> (1) whether the statute is the sole source of any tort duty from the defendant to the plaintiff or merely supplies a standard of conduct for an existing common law duty; (2) whether the statute puts the public on notice by clearly defining the required conduct; (3) whether the statute would impose liability without fault; (4) whether negligence per se would result in ruinous damages disproportionate to the seriousness of the statutory violation, particularly if the liability would fall on a broad and wide range of collateral wrongdoers; and (5) whether the plaintiff's injury is a direct or indirect result of the violation of the statute.

Plaintiff's negligence per se claim does not meet the first factor because section 748.3357(b)(2) is the sole source of the duty to provide 60 square feet of bedroom floor space to a child. There is no corresponding duty under Texas common law. *See Holcombe v. United States*, 388 F. Supp. 3d 777, 802 (W.D. Tex. 2019) (holding lack of "Texas common-law duty that corresponds with the Brady Act's reporting requirements . . . is fatal to plaintiff's negligence per se claims under Texas law"). Texas appellate courts have exercised judicial restraint when asked to create a new cause of action under state law based on a statutory duty that does not exist under the common law. *See Trevino v. Ortega*, 969 S.W.2d 950, 951 (Tex. 1998) ("This Court treads cautiously when deciding whether to recognize a new

tort."); *Perry*, 973 S.W.2d at 307 ("[T]his Court in fact has created a new duty by applying negligence per se on only one occasion."); *see also Smith v. Merritt*, 940 S.W.2d 602, 608 (Tex. 1997) (holding "that providing alcohol . . . in violation of section 106.06 of the TABC, is not sufficient to establish a negligence per se cause of action against a social host. To hold otherwise would ignore the intent and policies of the Legislature."). Federal district courts in Texas have followed suit. *See Brighthouse Life Ins. Co. v. Daboub*, Civil Action No. 3:21-cv-00543, 2021 WL 6198074, at *14 (N.D. Tex. Dec. 30, 2021) ("[I]n light of the Texas Legislature's decision to not include a private right of action in the Texas Life Settlements Act, as well as the absence of any applicable preexisting common law duty, the Court declines to create a new cause of action based on a theory of negligence per se, particularly where the Texas Supreme Court has recognized that doing so could have 'an extreme effect' on the common law of negligence."); *Arlington Indep. Sch. Dist. v. Hope Found., Inc.*, Civil Action No. 4:-08-CV-0575-BE, 2009 WL 10678309, at *4 (N.D. Tex. Mar. 6, 2009) ("[T]he general rule [is] that there is no common law duty of disclosure. To create another exception based on a failure to file the questionnaire required by Chapter 176 would establish a new basis for liability, which the Texas Supreme Court disfavors."); *see also Doe v. St. Stephen's Episcopal Sch.*, Case No. A-09-CA-537-SS, 2010 WL 11601327, at *2 (W.D. Tex. Feb. 26, 2010) (declining to adopt failure to report child abuse as negligence per se where Texas law had not recognized that common law duty). This factor weighs against granting the relief sought.

Plaintiff's negligence per se claim does not meet the second *Perry* factor because section 748.3357 does not clearly put the public on notice of the required conduct. CoreCivic presents summary judgment evidence that TDFPS recognized there was confusion surrounding for requirements for floor space in a bedroom used by a child when it amended that rule in 2016. *See* https://texashistory.unt.edu/ark:/67351/metapth712779/m2/1/high_res_de/022.pdf ("However, because

the rule text initially generated confusion and concern regarding the scope and purpose of the exceptions, TDFPS has modified the proposed text to provide further clarification."). Moreover, section 748.3357(d) states that, "[n]otwithstanding subsection c" governing exemptions, TDFPS has "authority for placing conditions on the scope of exceptions authorized for a family residential center." 26 Tex. Admin. Code § 7483357(d). This further demonstrates that it is not clear what is required in every instance. This factor also weighs against granting relief.

The third factor has been met because section 748.3357(b)(2) would impose liability on CoreCivic without fault. CoreCivic presents summary judgment evidence that, during TDFPS inspections of STFRC in July 2017 and October 2017, no deficiency was found in the Interior Space of the Physical Site under § 748.3357. (Docket no. 95-2, para 98–101, 103). An inspection in January 2018 also found no such deficiency. (*Id.*, para 02–103).

Arguably, the fourth *Perry* factor shows that adopting plaintiff's theory of negligence per se would result in ruinous damages disproportionate to the alleged violation of the floor space requirement, which would fall on a broad range of wrongdoers. Chapter 748 contains no enforcement provision. Moreover, it provides only an administrative remedy–which TDFPS has discretion to impose–to fine violations of plans, policies or procedures. 26 Tex. Admin. Code § 748.129.

Plaintiff has also failed to meet the fifth *Perry* factor, which asks whether "the plaintiff's injury is a direct or indirect result of the violation of the statute." 937 S.W.2d at 309. In leaving the issue of causation for trial, plaintiff has not shown or even argued that Mariee's viral infection was the direct or indirect result of the violation of the minimum bedroom floor space requirement. Moreover, imposing a new common law duty as plaintiff requests under section 748.3357 would essentially make CoreCivic the insurer of Mariee's safety, regardless of whether the bedroom floor space created a risk of her contracting a viral infection, whether CoreCivic knew or should have known of the risk, or

whether the floor space proximately caused Mariee's injury.  Thus, the *Perry* factors weigh against adopting plaintiff's theory of negligence per se.  *See Arlington Indep. Sch. Dist. v. Hope Found., Inc.*, Civil Action No. 4:08-CV-0575-BE, 2009 WL 10678309, at \*5 (N.D. Tex. Mar. 6, 2009) (finding it unnecessary to address all five *Perry* factors "because even if the remaining factors are indulged in favor of imposing liability, they cannot overcome the compelling nature of the other two factors").

For these reasons, plaintiff's motion for partial summary judgment on her negligence per se theory of recovery is DENIED and CoreCivic is GRANTED summary judgment on plaintiff's negligence per se and gross negligence per se causes of action.

IX.  CoreCivic's Motion for Summary Judgment

A.  Negligence and Gross Negligence: Alleged Unsafe, Unsanitary Living Conditions

As noted, plaintiff  alleges the living conditions at STFRC–an ICE family residential center operated by CoreCivic—were unsafe and unsanitary for small children and that those conditions led to the sickness and death of plaintiff's then-21-month-old daughter Mariee.  CoreCivic moves for summary judgment in its favor on all claims arguing:  (1) plaintiff lacks standing to a survival action on behalf of Mariee's estate because the estate is not named as a party, (2) plaintiff lacks legal capacity to bring a survival action as Mariee's personal representative or heir, (3) CoreCivic is entitled to derivative immunity; and (4) plaintiff's wrongful death/negligence claims fail as a matter of law because she cannot establish CoreCivic's negligence (or gross negligence) for Mariee's contraction of a viral infection and subsequent death.  Plaintiff responds that she has standing and capacity to pursue a survival action on behalf of Mariee's estate, CoreCivic is not entitled to derivative immunity, and that "[t]he record in this case contains enough evidence to easily advance plaintiff's living conditions claims to trial."  (Docket no. 101 at page 2).

B.  Standing:  the Absence of Mariee's Estate as a Party

CoreCivic's jurisdictional challenge to plaintiff pursuing a survival claim is that "only Mariee's estate has standing to bring survival claims" and "Mariee's estate is *not* a party to this suit."  (Docket no. 95 at page 11) (emphasis in original).  Although a decedent's estate has a justiciable interest in a survival action sufficient to confer standing, *Austin Nursing Ctr., Inc. v. Lovato*, 171 S.W.3d 845, 850, 851 n.3 (Tex. 2005), it is not a legal entity and may not properly sue or be sued as such.  *Id.* at 849 (citing *Price v. Estate of Anderson*, 522 S.W.2d 690, 691 (Tex. 1975)).  Accordingly, Mariee's estate would not be proper party to this suit. *Gomez v. Texas Windstorm Ins. Ass'n*, No. 13-04-598-CV, 2006 WL 733957, at *3 (Tex. App. Mar. 23, 2006, pet. denied).  CoreCivic's motion for summary judgment based on standing is denied.

C.  Legal Capacity of Plaintiff

CoreCivic next argues plaintiff does not have legal capacity as a personal representative or heir at law to pursue a survival action.  Plaintiff admits she has not been qualified by a probate court as a personal representative, but contends she is qualified to proceed as Mariee's heir at law.  An heir at law may appear as a representative of the decedent's estate if the heirp leads and proves that no administration of the decedent's estate is pending or necessary. *Frazier v. Wynn*, 472 S.W.2d 750, 752 (Tex. 1971).  CoreCivic points out that plaintiff has done neither.

Yet, CoreCivic did not challenge plaintiff's legal capacity until it filed its motion for summary judgment, more than three years after plaintiff filed her original and almost three years after CoreCivic filed its answer.  An argument can be made that the objection has been waived.  As one court has stated:

> This is purely a matter of pleading and is governed by the Federal Rules of Civil Procedure, more particularly Rule 9(a), which deals with capacity to sue. Rule 9(a) specifically provides that the capacity authority of a party to sue need not be averred. It further provides that lack of capacity is an affirmative defense which must be raised by answer. Having failed to assert it by motion prior to answer or in the answer itself, defendant must be held to have waived its objection.

*Young v. Pattridge*, 40 F.R.D. 376, 379 (N.D. Miss. 1966) (internal quotation omitted) (finding right to raise issue of plaintiff's capacity to sue was waived where defendant waited more than seven months after second amended complaint and more than three months after answer on merits was filed before attacking by motion to dismiss plaintiff's capacity to sue).[4]  This holding is in line with decisions by the United States Court of Appeals for the Fifth Circuit.  *Bankston v. Burch*, 27 F.3d 164, 166-67 (5th Cir. 1994) (explaining that failure to plead lack of capacity waives right to object); *Ralston Oil & Gas Co. v. Gensco, Inc.*, 706 F.2d 685, 691–92 (5th Cir. 1983) (explaining that objections to capacity are waived if not timely asserted); *Lang v. Tex. & Pac. R.R.*, 624 F.2d 1275, 1277 (5th Cir.1980) (explaining that if defendant fails to plead that plaintiff lacks capacity, objection is waived and defense is lost); *see also* FED. R. CIV. P. 9(a)(2) (governing "Pleading Special Matters" and providing that party seeking to challenge capacity "must do so by a specific denial, which must state any supporting facts that are peculiarly within the party's knowledge").

Procedural defects aside, CoreCivic argues plaintiff cannot maintain a survival action as an heir at law because she cannot prove no administration is necessary given the hospital debt plaintiff seeks to recover in this case.  (Docket no. 95 at page 12) (citing *Shepherd v. Ledford*, 962 S.W.2d 29 (Tex. 1998)).  Under Texas law, administration of an estate is generally necessary if "two or more debts exist against the estate" or "there is a desire to have the county court partition the estate among the distributees." Tex. Estates Code § 306.002(c)(1)-(2).  Plaintiff responds that, although there may be debts for Mariee's medical care, she is under the obligation to pay these and Mariee's estate is under no obligation to repay plaintiff.  In making her argument, plaintiff cites *Lopez-Franco v. Hernandez*, 351 S.W.3d 387, 392 (Tex. App.–El Paso 2011, pet denied), where the Court found the mother of the

---

[4]  "While it is undoubtedly true that capacity to sue is to be judged by the law of [Texas], the state in which [this federal district] court sits, as is provided by Rule 17(b) of the Federal Rules of Civil Procedure, this is true only when the right to object hereto has not been waived, as it has here." *Id.* at 378.

deceased had capacity although there was a debt of the estate because there was no promise to repay the money and the deceased could not have made such a promise as she was three years old.

CoreCivic replies that plaintiff "misplaces reliance on *Lopez-Franco* because the mother did not seek recovery of damages for a survival claim but rather the child's share of life insurance proceeds from her father's death because the child died before receiving it." (Docket no. 106 at page 2) (citing 351 S.W.3d at 390). CoreCivic further contends the summary judgment evidence shows Mariee is "survived by her father—who is named as a father on Mariee's official death certificate and whose paternity plaintiff has acknowledged under oath." (Docket no. 106 at page 2) (citing Docket no. 95-12 at page 33 & docket no. 95-13 at 5). CoreCivic therefore argues that Mariee's father is entitled to an equal share of Mariee's estate and plaintiff has presented no evidence that Mariee's father has agreed to forego his share.

In *Lopez-Franco*, the appellate Court held that a parent of a minor child had capacity to represent the child's estate even though the parent was not appointed as the child's personal representative. 351 S.W.3d at 391-92. The Court explained that under *Shepherd v. Ledford*, 962 S.W.2d 28, 31 (Tex. 1998), an heir may appear as a representative of a decedent's estate if the heir proves that no administration of the decedent's estate is pending or necessary. *Id.* at 392. Contrary to CoreCivic's argument, the Court determined that the fact *Lopez-Franco* involved life insurance proceeds, rather than a survival action as in *Shepherd*, was irrelevant. *Id.* at 392.

Likewise, it did not matter that the parent paid for the child's funeral. *Id.* Although the Court found that the payment created a debt of the estate, there "was no evidence of a promise to repay the money, nor could [the three year old] have made such a promise given her age." *Id.* The Court also noted that there was no evidence that two potential heirs desired to have estate partitioned or that they had any conflicting interests of claims. *Lopez-Franco*, 351 S.W.3d at 392. Finally, in concluding that

no administration of the estate was necessary and that plaintiff had capacity to bring suit as an heir at law, the Court stressed that Texas Probate Code § 178(b) does not authorize an administration unless it is necessary. *Id.* Under the circumstances, the Court is not persuaded by CoreCivic's argument that plaintiff's reliance on *Lopez-Franco* is misplaced. Accordingly, presuming the objection is not waived, the Court finds plaintiff has legal capacity as heir at law to pursue survival claims on behalf of Mariee's estate. CoreCivic's motion for summary judgment on the issue of lack of capacity is therefore denied.

D. Derivative Immunity: Negligence and Gross Negligence

Similar to the derivative immunity argument made in response to plaintiff's motion for partial summary judgment on the issue of negligence per se, CoreCivic argues it was a private contractor which operated STFRC under ICE's authority and at its specific directions and therefore CoreCivic derives the federal government's immunity against plaintiff's negligence claims under *Yearsley v. W.A. Ross Construction Co.,* 309 U.S. 18 (1940), and *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988). Neither *Yearsley* nor *Boyle* stands for the proposition that CoreCivic can rely upon ICE's authority and specific directions when building STFRC to bypass its obligation to operate the facility in a safe and sanitary manner.

CoreCivic contends that plaintiff may not claim it was negligent due to "cramped living space due to the layout or dimensions of the rooms" because "CoreCivic was contractually obligated to construct STFRC to ICE's specifications." (Docket no. 95 at page 16). This is internally inconsistent with a different position CoreCivic takes in its motion. CoreCivic elsewhere argues that "in constructing and operating STFRC" it "conformed to precise specifications that ICE *reviewed and approved*." (*Id.*) (emphasis added). This suggests CoreCivic came up with the specifications. Moreover, there is no dispute the Performance Work statement requires that "all facilities meet all applicable State licensing requirements for residential childcare facilities and adult shelter care

facilities." (Docket no. 101, Ex. C at 1-2).  Finally, as noted, there is nothing in the Performance Work Statement or anywhere else in the record requiring coreCivic to fill the living suites to capacity. Accordingly, CoreCivic has not shown it is entitled to derivative immunity against plaintiff's claims of negligence and gross negligence.

E.  Plaintiff's Negligence Claims: Premises Liability

In its motion for summary judgment, CoreCivic next argues that plaintiff has not stated a claim for negligence based on a theory of premises liability.  (Docket no. 95 at page 15 n.4).  Plaintiff did not respond to this argument in her response to CoreCivic's motion for summary judgment.  Accordingly, to the extent plaintiff suggests she is raising a claim of negligence based on a theory of premises liability, she has abandoned or waived any such claim.  *See Black v. North Panola Sch. Dist.*,461 F.3d 584, 592 (5th Cir. 2006) (explaining party waives arguments related to legal issues not addressed in contesting dispositive motion); *see also United States v. Stanley*, 595 F. App'x 317 (5th Cir. 2014) (explaining that party's failure to raise issue or defense in response to dispositive motion constitutes waiver and subsequent filing of motion to reconsider does not abrogate waiver; *Clayton v. U.S. Xpress, Inc.*, 538 F.Supp.3d 707, 713 (N.D. Tex. 2021) (explaining that failure to raise issue or defense in response to dispositive motion constitutes waiver or abandonment).

F.  Negligence: Breach and Causation

To prevail on a common-law negligence claim in Texas, a plaintiff must prove three elements: "a legal duty owed by one person to another, a breach of that duty, and damages proximately caused by the breach." *Nabors Drilling, U.S.A., Inc. v. Escoto*, 288 S.W.3d 401, 404 (Tex. 2009) (quoting *D. Houston, Inc. v. Love*, 92 S.W.3d 450, 457 (Tex. 2002)).  Liability is grounded in the public policy behind the law of negligence which dictates that one person owes another the duty to act as a reasonably prudent person would act under the same or similar circumstances regarding any reasonably foreseeable

risk. *Colvin v. Red Steel Co.*, 682 S.W.2d 243, 245 (Tex.1984); *Great Atl. & Pac. Tea Co. v. Evans*, 142 Tex. 1, 4, 175 S.W.2d 249, 250–51 (1943). CoreCivic does not dispute it had a duty to provide Mariee with safe and sanitary living conditions. The Court therefore turns to the issues of breach and causation.

CoreCivic first argues it has shown as a matter of law that it breached no duty of care. Specifically, CoreCivic asserts that "[t]o hold an individual negligent for transmitting an infectious disease, it must be proved that the defendant knew of the presence of the disease," and plaintiff has not done so. (*Id.*) CoreCivic derives this proposition from *Andrews v. MV Transportation*, 126 F. Supp. 3d 9 (D.D.C. 2015), but that case is distinguishable. In *Andrews*, bus passengers brought suit against a bus company on a theory of vicarious liability, alleging they were exposed to tuberculosis by a driver who had the disease. *Id.* at 12. The Court granted summary judgment in favor of the bus company because there was no evidence from which a jury could find that the driver knew he had a serious illness. *Id*. This case does not involve an employee with a latent or indiscernible disease which was unknown to an employer.

CoreCivic next argues that "plaintiff cannot genuinely dispute that CoreCivic acted reasonably and prudently under the circumstances by implementing comprehensive and robust measures to maintain a high level of sanitation and hygiene during Mariee's detention at STFRC." (Docket no. 95 at page 16). Yet, plaintiff offers the opinions of two expert witnesses that the sleeping conditions at STFRC were not safe and sanitary for small children. Dr. Katherine Peeler, a pediatrician at Boston Children's Hospital and an instructor of pediatrics at Harvard Medical School, will testify that "the living conditions at STFRC in March 2018 were not safe and sanitary for small children," because, among other things, the 30 inches of physical space between the bunk beds in the living suites at the STFRC "do not even meet the bare minimum of professionally recommended distance to maintain safe social distancing and thus greatly increase the likelihood of spread of infectious respiratory pathogens."

(Docket no. 101 at Exhibit I).  Similarly, plaintiff's expert Dr. Colleen Kraft, a pediatrician at Los Angeles Children's Hospital and a former President of the American Academy of Pediatrics, will testify, among other things that the living suite where plaintiff and Mariee were detained had "no area available for isolation if a parent has an ill child, or is feeling sick themselves." (*Id.* at Exhibit J).  Dr. Kraft will also testify that, because the record shows there were "approximately 1,657 residents at [STFRC] when M. Juárez and Mariee arrived," yet that "the facility could house about 2,400 residents," it would have been appropriate to house these mothers and children in more of the units," which "would have decreased crowding and the risk of infections."  (*Id.* at page 5).

CoreCivic contends that, "[a]lthough plaintiff generally alleges that the conditions were crowded or that sick residents were not medically isolated, ICE controlled the resident population and was solely responsible for medically screening residents and determining whether it was appropriate to house them in the general population."  (Docket no. 95 at page 16) (citing Conry Dep. Tr. (Ex. A) at ¶¶ 130–131).  Plaintiff points out that, while it is true CoreCivic's representative believed that "ICE medical is the only personnel that can instruct us to keep residents away from other residents in any kind of isolation or quarantine manner," (docket no. 101) (citing Conry Dep. Tr. (Ex. F) at 182:25–183:2), he also admitted that CoreCivic was responsible for referring residents who appear sick to ICE medical. (*Id.* at 181:23–182:4 ("We have a very robust referral and emergency process or any resident, adult or child, who either appears to be sick or somebody tells us is sick, whether that's another staff member, a volunteer, or a mom, for instance, that there are procedures that we regularly use in those circumstances.").

CoreCivic next argues it cannot be held liable for breaching any duty of care to provide Mariee with safe and sanitary living conditions because plaintiff failed to file a grievance or otherwise raise any concern with CoreCivic so that it could be promptly be addressed.  Plaintiff admits she did not file a

formal complaint.  Yet, she argues she did in fact report a sick child to a CoreCivic employee but CoreCivic did not refer the child to ICE medical staff.  To this end, plaintiff contends she testified during her deposition that one of the other mothers in the living suite where she was housed at the STFRC had a visibly sick child, a little boy about four or five years old.  (Docket no. 101 at page 14) (citing Y. Juárez Dep. Tr. at 38:14–19; *see also id*. at 49:19–21 ("the boy who was sick, he would just cough or sneeze anywhere, and it was like that in a lot of different areas.").  Yet, according to plaintiff "when Ms. Juárez reported to a CoreCivic employee that this boy was visibly sick, (*id.* at 55:4–8), the employee told her that it she should "find a way to keep your daughter away from that boy," but that he "couldn't do anything because it wasn't his job." (*Id.* at 55:15–18)."

CoreCivic replies that this is not an accurate characterization of plaintiff's deposition testimony. According to CoreCivic, "the transcript shows that plaintiff stated only that she had a brief encounter with an unknown 'employee,' when plaintiff went to ask him for a toothbrush."  (Docket no. 106 at page 6) (citing Juárez Dep. Tr. at 55:9-57:15).  CoreCivic maintains that, because they had difficulty communicating, they did not say anything beyond greeting each other and this "conversation."  (*Id.*). Moreover, CoreCivic continues, plaintiff incorrectly attributes the statement that "he couldn't do anything because it wasn't his job" to that person.  (*Id.*).  CoreCivic concludes that "[t]his was not something he said but what plaintiff concluded from their encounter."  (*Id.*) (citing Juárez Dep. Tr. at 55:10-25).  Neither party included the transcript of plaintiff's deposition testimony as one of the many exhibits attached to their motions for summary judgment.  Accordingly, the question of the interpretation of this evidence remains an issue for trial.  *See* FED. R. CIV. P. 56(c) (parties cannot rely on pleadings but must set forth evidence that supports granting or denying summary judgment).

Plaintiff also responds that CoreCivic provided unsafe and unsanitary living conditions because the sick boy and his mother were present in the living suite for the entire time she and Mariee were

detained at STFRC. (*Id.*) (citing Juárez Dep. Tr. at 39:4–7). She contends it was also difficult to self isolate herself and Mariee because the boy was sleeping in the directly adjacent bunk bed "just inches away." (*Id.*) (citing Juárez Dep. Tr. at 38:20–24). And, plaintiff maintains, she and Mariee had to spend much of their time in the living suite in general because the STFRC imposed "strict schedules" restricting the times detainees could be outside their living suites.

The record is undisputed that the distance between the bunk beds was 30 inches. CoreCivic replies that: (1) 2½ feet is not mere inches away; (2) the distance between detainees is increased to 3½ feet (40 inches) when each detainee in an adjacent bed slept in the middle of the bed, (Docket no. 95-2 at para 25); and (3) detainees in adjacent beds could further increase the distance between their pillows to approximately 6 feet (56.6 inches) by sleeping head-to-toe. (*Id.* at para 26). CoreCivic also replies that the beds were made of solid metal thus providing an adequate barrier. (*Id.* at para 27). Finally, CoreCivic replies that plaintiff was able to take additional precautions, including placing a barrier at the edge of the bunk (*id.* at para 28), and placing Mariee in a crib at the end of her bunk with a curtain around the crib, which would have not only provided an additional enclosure for Mariee, but also left her bunk vacant. (*Id.* at para 23, 29).

Plaintiff does not dispute that she was offered a crib for Mariee and refused it. (Docket no. 95-2, para 152). She does not deny that she failed to take any of these precautions. Plaintiff admits she chose to have Mariee sleep with her in the same bunk instead of her own bunk. (Juárez Dep. Tr. at 51:17–52:2).

With regard to the time detainees could spend outside their living suites, CoreCivic submits that STFRC's schedule did not force plaintiff to stay in her suite. STFRC operated on a schedule from m 5:30 a.m. to 12:00 a.m., and residents were permitted to move around the facility from 8:00 a.m. to 8:00 p.m. (Docket no. 95-2, para 53). At 8:00 a.m., multiple facility services opened (*e.g.*, social visitation,

apartment complex laundry services, neighborhood recreation activities, chapel and religious programs, monitored childcare, school session, and physical education for Pre-K and K-1). (*Id*. at para 54). Detainees also had access to the areas within their housing complexes; the suites were not locked and detainees were allowed to leave to do laundry, get snacks, use the restrooms, shower, or to go to the common areas in the housing complexes. (*Id*. at para 55).

Moreover, plaintiff agreed that "her housing suite was not locked," and she was "free to come and go from [her] housing suite." (Juárez Dep. Tr. at 45:19–46:6). Plaintiff also stated that she believed CoreCivic's schedule was "strict" only because she "couldn't be roaming after dinnertime or at night," and there were certain hours that she could go outside to play with Mariee. (*Id*.) Plaintiff additionally stated that she might spend "some five hours inside" and "two hours" playing outside with Mariee, but she "always like[d] to spend more time" inside because "I've always been more of a homebody." (*Id*. at 52:8–53:15).

Finally, plaintiff points to other evidence she contends show living conditions were unsafe and unsanitary. Civic's records show that, on March 6, 2018, the first full day of their detention, the other housing neighborhoods were substantially less crowded. (Docket no. 101, Exhibit K). Indeed, some of the neighborhoods had complexes which were completely empty with no population at all. (*Id.*); *see also* Conry Dep. Tr. (Ex. F) at 162:16-23) (admitting there were some housing complexes that were "completely unoccupied"). And CoreCivic's representative admitted that after the time during which plaintiff and Mariee were detained at STFRC, CoreCivic did reduce the number of residents in the neighborhood to which they were assigned substantially and redistributed more of the resident population into the less-crowded neighborhoods. (Conry Dep. Tr. (Ex. F) at 173:19-176:9). Thus, plaintiff argues:

> CoreCivic certainly had the ability during the relevant time period to re-distribute the resident population throughout the different housing neighborhoods and complexes to

reduce the number of living suites that were at full capacity, they just simply failed to do this during the time Ms. Juárez and her daughter were detained, and thus unnecessarily required her to live in a suite crowded with 12 occupants, including sick children–which a jury could easily find to have been negligent, if not reckless, particularly in winter months when transmission of respiratory infections are especially common." (C. Kraft Exp. Rep. (Exh. J) at page 6 (Ms. Juárez and Mariee "were housed in the crowded conditions at Yellow Frog during the winter, when respiratory illnesses are at their peak.").

(Docket no. 101 at page 16).

CoreCivic admits it failed to redistribute the residents in her suite to less crowded or empty complexes in other neighborhoods, but argues there was no breach of any standard of care. According to CoreCivic, the housing classifications were designed to maintain the family unit upon intake based on five different classifications according to the age and/or gender of the children. (Docket no. 95-2, para 135). To this end, CoreCivic contends families classified in a group were only housed with other families in that group for safety by separating children of different ages and gender, not to prevent the spread of illnesses or disease. (*Id*. at paras 136–37). Thus, CoreCivic concludes, residents–including plaintiff and Mariee–were not placed in an emptier neighborhood due to age and gender restrictions. (*Id* at para 151). Yet, as plaintiff points out, there is nothing in the Performance Work Statement (or anywhere else in the record) requiring CoreCivic to fill the living suites to capacity, particularly at times when there is empty space in the facility that would enable greater personal spacing between detainees.

After thoroughly and carefully reviewing the entire record, including the various affidavits deposition transcripts and other evidence, the Court finds plaintiff has raised a genuine dispute of material fact with respect to whether CoreCivic breached its duty to provide Mariee with safe and sanitary living conditions. The Court now turns to the question of causation.

The Court ruled that plaintiff's experts may testify that "conditions at STFRC substantially increased the likelihood that [Mariee] would contract an illness." (Docket no. 91 at page 2). To this end, plaintiff has offered the testimony of two experts. Dr. Peeler, for example, would testify that the

infections Mariee contracted, adenovirus and parainfluenza 3 are "common causes of pediatric respiratory infections, with a major risk factor for their incidence and severity being contained in a crowded environment." (Docket no. 100, K. Peeler Exp. Rep. (Exh. I) at 8). "Given the infectiousness of both adenovirus and [parainfluenza 3] and known infectiousness in crowded settings," Dr. Peeler concludes that "the living conditions at the STFRC drastically increase the likelihood of spread of these two viral illnesses" and that "the living quarters are small, without separate spaces to self-isolate if desired, the beds are not far enough apart per the aforementioned expert guidelines, and there are numerous common surfaces." (*Id*. at 9.9). Dr. Peeler's analysis also examines the incubation periods of both adenovirus and parainfluenza in order to determine the range of possible dates on which Mariee might have contracted these infections based on when she started showing symptoms, and concludes these ranges fall almost entirely within the time plaintiff and Mariee were detained at the STFRC. Plaintiff contends this is important because the incubation period represents the period "from the time of being infected to showing symptoms." (*Id*. at 8. Dr. Peeler concludes that the incubation period for adenovirus is 2-14 days for respiratory tract disease (3-10 days for gastrointestinal disease) and 2-6 days for parainfluenza. (*Id*. at 8–9). Mariee's first symptoms, according to Dr. Peeler and based on her review of the record, most likely started to occur on March 11, 2018, when plaintiff brought Mariee to the STFRC clinic with symptoms of cough, congestion, and runny nose. (Docket no. 101, K. Peeler Reb. Exp. Rep. (attached as Exhibit O) at 2). Because Ms. Juárez and Mariee arrived at the STFRC on March 5, 2018—6 days before Mariee began showing symptoms—this arguably puts the entire range of possible incubation periods for parainfluenza 3 within the time plaintiff and Mariee were detained at STFRC and nearly half the range of possible incubation periods for adenovirus. However, Dr. Peeler also cites medical studies pooling analyses of viral incubation periods for both diseases which conclude that the median of all incubation periods observed for adenovirus was 5.6 days and that the 75th was

6.5 days (meaning that 50% of people who contract adenovirus will have symptoms within 5.6 days of being infected and 75% will have symptoms within 6.5 days of being infected). Because Mariee was living at STFRC for a period of time that contains the entire range of incubation periods for one of her diagnosed infections, and more than 50% of the range of incubation periods for the other of her diagnosed infections, plaintiff contends a reasonable jury could certainly conclude that it was more likely than not that the living conditions were a substantial contributing factor to the cause of her illness.

This being said, plaintiff is prohibited from offering an expert opinion that "the conditions at STFRC were the cause of Mariee's illness." (Docket no. 91 at page 2). CoreCivic therefore argues that plaintiff lacks reliable expert testimony that Mariee actually contracted the virus at STFRC, and thus cannot prove that CoreCivic proximately caused Mariee's viral pneumonia infection. In support of this proposition, CoreCivic cites cases which the Court finds to be distinguishable.

In two of the cases, the plaintiffs' actual exposure to the toxic substance at issue was in dispute. *See Schafer v. Texas Employers Insurance Ass'n*, 612 S.W.2d 199, 203 (Tex. 1980) (finding that expert's opinion was insufficient to establish causation where he presumed employee contracted rare form of tuberculosis at his job because he worked in soil contaminated by bird droppings); *Abraham v. Union Pacific R.R. Co.*, 233 S.W.3d 13, 21 (Tex. App.–Houston [14th Dist.] 2007, pet. denied) (finding that expert's opinion was insufficient to establish causation where he relied on government studies linking occupational creosote contact to cancer, but there was no evidence showing that railroad's employees' exposure to creosote was equal to or greater than exposure in the studies).

In this case, it is undisputed that Mariee was actually exposed to adenovirus and/or parainfluenza. Mariee's actual exposure to adenovirus and/or parainfluenza is not materially in dispute. *See* (Docket no. 101 at Exhibit M) (medical records diagnosing Mariee with these conditions); *see also* (*Id.* at Exhibit M at pages 5-6) (CoreCivic's medical expert concurring that Mariee's medical records

show presence of adenovirus and parainfluenza). Still, even in the context of exposure cases, Texas law permits a plaintiff to establish causation by "rely[ing] on studies showing an increased risk of their particular injury from exposure to the substance at issue to raise a fact question on causation," so long as the plaintiff is "similar" to those at issue in the studies. *Georgia-Pac. Corp. v. Stephens*, 239 S.W.3d 304, 310 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) (citation omitted). Plaintiff's experts base their opinions that the living conditions at STFRC substantially increased the risk that Mariee would contract the diseases at issue on studies of those diseases involving children. (Docket no. 101 at Exh. I, pages 8-9) (citations omitted).

*Davis v. Cruise Operator, Inc.*, No. 16-CV-62391, 2017 WL 3057610, at *5-*6 (S.D. Fla. July 19, 2017), concerned a cruise ship passenger who alleged she contracted the Norwalk Virus/Norovirus as a result of food contamination and unsanitary conditions while she was a passenger on board defendant's ship. *Davis* is distinguishable because it involved a plaintiff who offered no expert testimony. In this case, plaintiff has offered two experts who will testify regarding causation. Additionally, a recent case from the Southern District of Florida considered facts similar to Davis–but the plaintiff offered expert testimony–and denied summary judgment even though the expert may not have been able to "identify the precise source" of the plaintiff's COVID-19 infection. *Landivar v. Celebrity Cruises, Inc.*, Case No. 21-20815-CIV-ALTONAGA/Torres, 2022 WL 375273, at *7 (S.D. Fla. Feb. 8, 2022).

Finally, CoreCivic points to certain evidence they believe demonstrates that Mariee had symptoms of one or the other virus prior to arriving at STFRC. There is also evidence that Mariee was healthy upon arriving at STFRC and not experiencing any symptoms. (Docket no. 101 at Exhibit N) (records of Mariee's medical exam upon arriving at STFRC). For these reasons, the Court finds plaintiff has raised a triable issue of material fact on her negligence claims.

G.  Gross Negligence

Finally, the Court turns to plaintiff's gross negligence cause of action.  In Texas, gross negligence requires a showing of two elements:

> (1) viewed objectively from the actor's standpoint, the act or omission complained of must involve an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and (2) the actor must have actual, subjective awareness of the risk involved, but nevertheless proceed[s] in conscious indifference to the rights, safety, or welfare of others.

*Lee Lewis Constr., Inc. v. Harrison*, 70 S.W.3d 778, 785 (Tex.2001).  CoreCivic argues plaintiff cannot establish the objective element because "from CoreCivic's perspective," STFRC's living space and sanitation practices "were not defective in any way." (Docket no. 95 at page 19).  However, CoreCivic's beliefs are not "objective."  CoreCivic also argues plaintiff cannot establish the subjective element.  However, plaintiff contends that CoreCivic was "actually aware" of "extreme danger" due to unsafe and unsanitary conditions.  Specifically, plaintiff contends that "CoreCivic routinely overcrowded the housing complexes at the STFRC without providing sufficient space in each living suite to accommodate the assigned residents" and "the record evidence demonstrates that they knew they could have provided additional living space, but did not do so in order to save money."  (Docket no. 96 at pages 19–20 & Exhs. E–F).  This is sufficient to raise a triable issue of fact precluding summary judgment on the issue of gross negligence.

## X.  Conclusion

In sum, the failure to join Mariee's estate as a party does not deprive plaintiff of standing to bring Mariee's survival claims.  CoreCivic has waived any objection to plaintiff's legal capacity to bring survival claims or alternatively plaintiff has established she qualifies as an heir at law to pursue such claims.  CoreCivic is not entitled to derivative immunity from plaintiff's claims based upon its status as a federal contractor given the amount of discretion it exercised in constructing and/or operating

STFRC. Plaintiff has abandoned or waived any premises liability claim she may be attempting to assert by failing to respond to CoreCivic's summary judgment arguments. Presuming plaintiff had properly pleaded a negligence per se cause of action, and could state a claim upon which relief could be granted, she does not attempt to raise a genuine issue of material fact that a violation of 26 Texas Administrative Code § 748.3357(b)(2) caused the illness which ultimately led to Mariee's death. Accordingly, her motion for partial summary judgment must be denied on this ground alone. CoreCivic, on the other hand, has presented summary judgment that section 748.3357(b)(2) is not a penal law or administrative rule which would subject it to liability under a negligence per se theory of recovery. CoreCivic's cross-motion for summary judgment on the issue negligence per se is therefore granted. Finally, plaintiff has raised genuine issues of material fact as to whether CoreCivic negligently created unsafe, unsanitary living conditions for Mariee while she was detained at STFRC. Therefore, CoreCivic's motion for summary judgment is denied.

IT IS THEREFORE ORDERED that Defendant CoreCivic, Inc.'s Motion for Summary Judgment (docket no. 95) is DENIED.

IT IS FURTHER ORDERED that Plaintiff Yazmin Juárez Coyoy's Motion for Partial Summary Judgment (docket no. 96) is DENIED.

IT IS FINALLY ORDERED that defendant's cross-motion for summary judgment on plaintiff's negligence per se theory of recovery (contained within docket no. 100) is GRANTED.

It is so ORDERED.

SIGNED this 11th day of October, 2022.

_____

FRED BIERY
UNITED STATES DISTRICT JUDGE